**UNITED STATES ex rel. Ila SWAN and Violette King, Plaintiff,**

v.

**COVENANT CARE, INC. et al., Defendants.**

**No. CIV–S–99–1891 DFL JFM.**

United States District Court, E.D. California.

Aug. 5, 2002.

---

Niall P. McCarthy, Cotchett Pitre Simon and McCarthy, San Francisco Airport Office Center, Burlingame, CA, Adisa–Mari Abudu–Davis, United States Attorney, Sacramento, CA, Gail Killefer, United States Attorney, Assistant United States Attorney, San Francisco, CA, for plaintiff.

Mark E. Reagan, Hooper Lundy and Bookman Incorporated, San Francisco, CA, for defendants.

### MEMORANDUM OF OPINION AND ORDER

LEVI, Chief Judge.

■ Plaintiff Ila Swan ("Swan") brings this action on behalf of the United States against defendant Covenant Care, Inc. and related corporations (collectively "Covenant Care") under the false records provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(2).[1] Swan alleges that Covenant Care routinely falsified patient records in order to conceal staffing and funding shortages which resulted in inadequate patient care at Emerald Gardens, Covenant Care's Sacramento nursing home facility. Covenant Care argues that Swan's claim falls under the public disclosure bar of the FCA, § 3730(e)(4)(A), which "limits qui tam jurisdiction to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware," because her allegations of records falsification were publicly disclosed in a civil lawsuit filed by a former Emerald Gardens patient prior to the filing of her FCA action. *See United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 678 (D.C.Cir.1997). Covenant Care also moves, in the alternative, for summary judgment, arguing that Swan's allegations do not support FCA liability under § 3729(a)(2).

### I. Facts and Procedural History

#### A. Procedural History

This qui tam action was originally filed under seal by Swan and Violette King ("King") on October 17, 1997. Swan and King are both advocates for nursing home reform who allege that they have personally witnessed multiple instances of substandard patient care at various Covenant Care nursing homes in California and Illinois. They generally allege that Covenant Care fails to meet the minimum statutory quality of care requirements for participation in federal Medicare and Medicaid programs. Plaintiffs' complaint was unsealed in March 1999 after the government concluded its own investigation and declined to intervene in the plaintiffs' action. (Def.'s Motion for SJ at 3). The court dismissed plaintiffs' claims on June 19, 2000 for failure to state a claim under the FCA and for failure to satisfy the particularity requirements of Fed.R.Civ.P. 9(b), but granted plaintiffs leave to amend their complaint. (June 19, 2000 Order at 11).

The plaintiffs subsequently filed a second amended complaint asserting claims under §§ 3729(a)(1) and (a)(2) of the FCA.[2] The amended complaint alleges that Covenant Care is liable under the FCA: (1) for falsely certifying compliance with Medicare and Medicaid requirements, and (2) for falsifying patient records in support of fraudulent Medicare and Medicaid reimbursement claims. On February 22, 2001,

---

**1.** The FCA permits private individuals, referred to as "relators," to bring suit on the government's behalf. *See United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 n. 7 (9th Cir.1996). "If the plaintiff succeeds in her qui tam suit, she shares the judgment with the government as a bounty. The purpose of the qui tam provisions of the FCA is to encourage private individuals who are aware of fraud being perpetrated against the government to disclose that information." *Id.* (citations omitted).

**2.** Section 3729(a)(1) imposes liability on any person who, "knowingly presents, or causes to be presented ... a false or fraudulent claim for payment or approval" to the United States Government. Under § 3729(a)(2) any person who "knowingly makes, uses, or causes to be made or used, a false record ... to get a false or fraudulent claim paid or approved by the Government" is also liable under the FCA.

the court dismissed the plaintiffs' false certification claim, explaining that such a claim requires an explicit false certification of compliance with federal requirements, the type of express misrepresentation by Covenant Care which plaintiffs had failed to identify. (Feb. 22, 2001 Order at 3–4).[3]

The court also held that plaintiffs' general allegations of Covenant Care's company-wide policy of falsifying patient records were too broad and vague to satisfy the particularized pleading requirements of Rule 9(b). (*Id.* at 5). The court accordingly limited plaintiffs' false records claim to the patient records falsification which allegedly occurred at Emerald Gardens between 1995 and 1997. (*Id.* at 4–6).[4] Swan serves as the sole relator on the remaining § 3729(a)(2) false records claim which focuses on Covenant Care's alleged falsification of patient records in support of its monthly Medicare reimbursement claims.[5]

## B. *Emerald Gardens*

Emerald Garden is a qualifying skilled nursing facility eligible to participate in the federal Medicare program. Covenant Care receives a per diem room and board payment from the government for each Medicare patient housed at Emerald Gardens. (Siegfried Depo. at 29:24–25). It submits these Medicare claims to the government on a monthly basis. (*Id.* at 31:19–25). Swan alleges that Emerald Gardens received an average of $700,000 per year in Medicare reimbursements between 1995 and 1997, the relevant time period for her FCA claim. (Opp. at 5).

Swan contends that Emerald Gardens was so severely understaffed during this period that patients were often denied the most basic care such as repositioning, feeding, bathing, and wound treatment. She alleges that Covenant Care administrators directed Certified Nursing Assistants ("CNAs") to alter patient charts to reflect that patients had received such routine care in order to conceal the chronic under-staffing at Emerald Gardens. Most of the evidence presented by Swan is directed towards the "back-charting" of Activities of Daily Living ("ADL") forms, forms that document items of routine care such as feeding, turning, and bathing, which skilled nursing facilities like Emerald Gardens are required to maintain for their Medicare patients. (Pl.'s Opp. n. 2).

Swan alleges that CNAs were required to fill in blank spaces on ADL forms as a condition of receiving their pay checks, falsifying the forms to reflect that Emerald Gardens patients had received routine care which was never provided. Her allegations are corroborated by various Emerald Gardens employees who claim that CNAs were back-charting or otherwise altering ADL forms on a daily basis during the relevant time period. For example, Mary Bailey, the former Director of Staff Development at Emerald Gardens, estimates that approximately 75% of the ADL forms from this period are inaccurate and that 90% of the ADL forms had been altered to falsely reflect that patients had been timely repositioned. (Bailey Depo. 31:3–35:8). Swan has also submitted specific evidence of false entries in the records of five exemplar Emerald Gardens patients. Her expert witnesses state that all five patients failed to receive basic acts of

---

**3.** The court also rejected plaintiffs' implied certification theory, noting that the Ninth Circuit has not adopted the implied certification theory of FCA liability recognized by some courts. (Feb. 22, 2001 Order at 3 n. 1).

**4.** Plaintiffs submitted the declarations of several former Emerald Gardens employees who asserted that they had either witnessed, or participated in, the alteration of patient records at Emerald Gardens during this period. (*Id.* at 4–6).

**5.** Plaintiff Violette King has never visited Emerald Gardens or spoken with any of its employees or residents. (Def.'s SUF at ¶ 29).

routine care which their medical records inaccurately list as having been provided. (Opp. at 13–15).

### II. *Public Disclosure Bar*

■ Jurisdiction over qui tam actions is limited by § 3730(e)(4)(A) of the FCA which provides that: "[n]o court shall have jurisdiction over [a FCA action] ... based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing ... unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A).[6] The purpose of this provision is to discourage opportunistic FCA suits by individuals "with no independent knowledge of [the] fraud [who] use information already available to the government to reap rewards for themselves without exposing any previously unknown fraud." *Seal 1 v. Seal A*, 255 F.3d 1154, 1158 (9th Cir.2001); *see also United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994) (the FCA's jurisdictional provisions reflect Congress' attempt to find "the golden mean between [providing] adequate incentives for whistleblowing insiders with genuinely valuable information [to come forward] and discourag[ing] opportunistic plaintiffs who have no significant information to contribute of their own").

■ To trigger the FCA's jurisdictional bar, a prior public disclosure "need not contain an explicit 'allegation of fraud,' so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." *See United States ex rel. Foundation Aiding the El-*

*derly v, Horizon West, Inc.*, 265 F.3d 1011, 1014 (9th Cir.2001); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1473 (9th Cir.1996) (same). In evaluating whether a qui tam plaintiff's suit is based upon public disclosures within the meaning of § 3730(e)(4)(A), the court must examine whether the public record reveals "enough information to enable the government to pursue [its own] investigation" into the defendant's activities. *Alcan*, 197 F.3d at 1019; *see also See United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C.Cir.1999) (under § 3730(e)(4)(A) "we inquire only as to whether the publicly disclosed information would have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing"). Accordingly, § 3730(e)(4)(A)'s jurisdictional bar is triggered whenever a plaintiff files a qui tam complaint containing allegations or describing transactions "substantially similar" to those already in the public domain so that the publicly available information is already sufficient to place the government on notice of the alleged fraud. *See Horizon West*, 265 F.3d at 1015; *Settlemire*, 198 F.3d at 918.

### A. *Bretz Lawsuit*

■ Covenant Care argues that Swan's qui tam claim falls within the FCA's jurisdictional bar, because the allegations of fraud underlying her claim were previously disclosed in a prior civil lawsuit filed by Ben Bretz ("*Bretz* lawsuit"), a former Emerald Gardens patient, who alleged that he received inadequate care while housed at Emerald Gardens between 1991 and 1996.[7]

---

6. Swan, as the qui tam plaintiff, "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *United States v. Alcan Electrical & Engineering, Inc.*, 197 F.3d 1014, 1018 (9th Cir.1999).

7. It is well settled that information contained in prior pleadings is a "public disclosure" within the meaning of § 3730(e)(4)(A). *See, e.g., Hagood*, 81 F.3d at 1474 n. 3. Moreover, "[a]n issue need not be decided in prior litigation for the public disclosure bar to be trig-

(Def.'s Request for Judicial Notice ("RJN") Exh. C). Bretz alleges that he suffered various injuries, including bedsores, severe dehydration and malnutrition, and multiple fractures, as a result of Covenant Care's knowing neglect of his health and that Covenant Care "falsified his records to make it appear as through his care and treatment was appropriate and performed as ordered." (*Id.* Exh. A at 7).[8]

Bretz further asserted that the medical records of other patients were also, "falsely charted, [and] that [the] acting Administrator and Director of Nurses [at Emerald Gardens] knew of the acts of fraud, and in fact that these managing agents of Covenant Care actually participated in acts of falsifying records." (*Id.* Exh. A at 11). Bretz also stated that Covenant Care was aware that Emerald Gardens, "was seriously understaffed, the staff who were employed were not qualified, and [that] staff shortages and [the] abuse and neglect of patients was the norm." (*Id.* at 11–12).

In addition, in his request for punitive damages, Bretz cites the deposition testimony of several Emerald Gardens employees who describe incidents of "false charting," including portions of the deposition testimony of Mary Bailey ("Bailey"), who is also a key witness in this case, in which Bailey acknowledges that patient medical records, including federally mandated Minimum Data Set forms and ADL forms, were sometimes filled in weeks after the medical care was supposedly provided and that Emerald Gardens administrators asked CNAs to fill in blank spaces on patient ADLs. (Def.'s RFN, Exh. B at 16–25).

B. *Application of Public Disclosure Test*

 In this case, the allegations in the *Bretz* lawsuit disclose the essential elements of Swan's false records claim, namely that: (1) Covenant Care was aware that Emerald Gardens was severely understaffed and that patients were receiving inadequate care as a result, and (2) that Covenant Care administrators instructed Emerald Gardens CNAs to falsify patient records, including ADL forms, to falsely indicate that patients were receiving the required level of routine care. Although Bretz's claims of false charting largely mirror her own allegations, Swan argues that the *Bretz* suit failed to reveal the essential fraudulent transaction at the core of her qui tam suit—that Covenant Care falsified patient records in order to obtain federal Medicare reimbursement. (Opp. at 8).

However, the *Bretz* suit specifically discloses the falsification of federally mandated forms, including the critical ADL forms, and links Covenant Care's allegedly fraudulent activity to its status as a licensed Medicare skilled nursing facility. For example, Bretz's second amended complaint asserts that Covenant Care falsely represented that the "care afforded to its patients [would] meet certain minimum criteria and standards, including but not limited to compliance with all state and federal regulations governing skilled nursing facilities" as part of its license application to the California Department of Health Services, the state agency that monitors compliance with federal Medicare regulations. (Def.'s RJN Exh. C at ¶¶ 58–59).

gered ... its mere disclosure suffices." *Id.* at 1474.

**8.** In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction,

the court may consider evidence outside the pleadings when the factual basis for the court's jurisdiction is disputed. *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

■ Although Bretz did not expressly allege that Covenant Care was submitting false Medicare claims, he disclosed all of the material elements of the alleged scheme, raising a sufficiently strong inference of wrongdoing to place the government on notice of the alleged fraud and publicly disclose the same pattern of records falsification presently alleged by Swan. *See Findley,* 105 F.3d at 687 (the FCA's jurisdictional bar is triggered when the "publicly disclosed transaction is sufficient to raise the inference of fraud"); *United States ex rel. Jones v. Horizon Healthcare Corp.,* 160 F.3d 326, 333 (6th Cir.1998) (prior complaint which "presented enough facts to create an inference" that the submission of false Medicare claim forms "either had occurred or was expected to occur" publicly disclosed the qui tam plaintiff's alleged fraud claims within the meaning of § 3730(e)(4)(A)).[9] Moreover, although Swan outlines Covenant Care's alleged pattern of Medicare fraud in greater detail, "a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent op-

eration of the jurisdictional bar." *See United States ex rel. Settlemire v. District of Columbia,* 198 F.3d 913, 919 (D.C.Cir. 1999).[10] The court therefore finds that Swan's qui tam suit is based on publicly disclosed information.

### C. *Original Source*

■ If the allegations underlying a qui tam plaintiff's suit have been publicly disclosed, the plaintiff may bring a FCA claim only if she is an "original source of the information." *See Seal 1,* 255 F.3d at 1159 (citing 31 U.S.C. § 3730(e)(4)(A)). To qualify as an original source, however, the plaintiff must have played a role in publicly exposing the alleged fraud in the first place. *See Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992) ("qui tam jurisdiction [is] meant to extend only to those who ... played a part in publicly disclosing the allegations and information on which their suit is based"); *Alcan,* 197 F.3d at 1020 (to qualify as an original source the plaintiff must have "had a hand in the public disclosure of allegations that are a part" of her suit). As plaintiff's counsel conceded at oral argument, Swan

---

9. In opposing Covenant Care's motion to dismiss, Swan relies heavily on *United States ex rel. Foundation Aiding the Elderly v. Horizon West, Inc.* 265 F.3d 1011 (9th Cir.2001), a case in which the Ninth Circuit held that a prior fraud lawsuit against several nursing home facilities did not bar a subsequent FCA action based on the facilities' alleged Medicare and Medicaid fraud. However, the prior lawsuit in *Horizon West* involved only general allegations that the defendant nursing homes had misrepresented the level of care provided to their residents. *See id.* at 1015.

By contrast, the *Bretz* pleadings contain more detailed allegations of fraud. The *Bretz* pleadings specifically allege that Emerald Gardens was understaffed and that Covenant Care had a policy of altering ADL forms to conceal the inadequate care provided to its patients. The *Bretz* pleadings also connect Covenant Care's alleged fraud to its status as a skilled nursing facility, eligible to partici-

pate in federal Medicare programs, thus raising an inference of Medicare fraud and disclosing the contours of the alleged fraud with much greater particularity that the prior lawsuit at issue in *Horizon West.* Finally, the *Bretz* lawsuit also identifies a key witness, Mary Bailey, a former Director of Staff Development at Emerald Gardens.

10. If Swan's own allegations had been more detailed and specific, her arguments against the application of the public disclosure bar would be more persuasive. However, Swan provides little additional information linking the alleged falsification of patient ADL forms to Covenant Care's Medicare billing practices. Swan submits some evidence that Covenant Care may have relied on the ADL forms to verify its own monthly Medicare claims, but she provides no further evidence that the government's payment of those claims was based on the patient ADLs. (Siegfried Depo. 57:10–58:19, 108:10–115:2).

was not involved in the *Bretz* lawsuit, and therefore can not qualify for the original source exemption under § 3730(e)(4)(A).

### D. *Conclusion*

Because the essential elements of Swan's qui tam claim were previously disclosed in *Bretz*, and Swan is not an original of the *Bretz* disclosures, the court lacks subject matter jurisdiction over her suit and must dismiss her FCA claim under § 3730(e)(4)(A).

### III. *FCA Liability*

Even if Swan's suit did not fall under the FCA's public disclosure bar, Covenant Care would still be entitled to summary judgment on her false records claim. As explained below, Swan's allegations of records falsification and inadequate care fail to support a cognizable theory of FCA liability.

### A. *Regulatory Violations*

Under the Social Security Act, 42 U.S.C. § 1395 *et seq.*, skilled nursing facilities, like Emerald Gardens, are required to adopt specified operating guidelines, conform to professional standards of care, and comply with all applicable federal and state regulations. *See, e.g.*, 42 U.S.C. § 1395i–3(d)(4)(A)("A skilled nursing facility must operate and provide services in compliance with all applicable Federal, State, and local laws and regulations . . . and with accepted professional standards and principles which apply to professionals providing services in such a facility."); 42 U.S.C. § 1395i–3(b)(1)(A) ("A skilled nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident.").[11]

The operation of skilled nursing facilities is governed by a comprehensive set of highly detailed and specific Medicare regulations. *See generally* 42 C.F.R. Part 483 (2001). For example, skilled nursing facilities must formulate a written plan of care for each Medicare resident to ensure that the resident's activities of daily living are maintained and that "[a] resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene." 42 C.F.R. § 483.25(a)(2) (2001). In addition, the SNF must "have sufficient nursing staff to provide nursing and related services to attain . . . the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by [the resident's] . . . individual plan of care" and maintain accurate and complete medical records for each resident "in accordance with accepted professional standards and practices." 42 C.F.R. §§ 483.30, 483.75(1)(2001).

The majority of Swan's allegations focus on Covenant Care's alleged failure to provide adequate care to its patients and purported falsification of records in violation of these federal regulations. However, the FCA is not a vehicle for ensuring regulatory compliance. *See, e.g., Anton,* 91 F.3d at 1267 ("[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA"); *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1020 (7th Cir.1999) ("the FCA is not an appropriate vehicle for policing

---

**11.** In 1987, as part of the Omnibus Budget Reconciliation Act, Congress amended the Social Security Act to enact a comprehensive set of nursing home reforms, imposing higher health and safety standards on nursing home facilities with Medicare provider agreements. *See* Federal Nursing Home Reform Act, Pub. L.No. 110–203 codified at 42 U.S.C. § 1395i–3. "These changes led in turn to more stringent standards for nursing home accreditation and participation." *Trade Around the World of PA v. Shalala,* 145 F.Supp.2d 653, 655 (W.D.Pa.2001).

technical compliance with administrative regulations"). The False Claims Act only attaches liability to false claims for payment, not to underlying activity that allegedly violates federal law. *See United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); *Anton*, 91 F.3d at 1266.

### B. *Worthless Services*

██ Swan argues that her false records claim proceeds on a worthless services theory and that Covenant Care is liable under the FCA for falsifying patient records to reflect that patients were receiving routine care which had not been provided, and then submitting reimbursement claims to the government based on the altered records. (Opp. at 5). Although the Ninth Circuit has recognized that "knowingly billing for worthless [medical] services" is actionable under the FCA, Covenant Care's allegedly fraudulent billing cannot be characterized as a true worthless services claim. *See United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048 (9th Cir.2001).

Covenant Care does not bill the government separately for individual acts of patient care such as feeding, turning, or bathing. Instead, the government pays Covenant Care a per diem rate for providing room and board, including the provision of such routine services, for each Medicare patient housed at Emerald Gardens. (Siegfried Depo. 54:4–18). Swan does not allege that Emerald Gardens failed to provide any services to its patients; she only challenges the level of care and the amount of services which the patients received as a result of the alleged under-staffing at Emerald Gardens. Because Swan does not allege that Covenant Care's neglect of its patients was so severe that, for all practical purposes, the patients

were receiving no room and board services or routine care at all, her FCA claim does not fit within the worthless services category. *See Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir.2001) ("[i]n a worthless services claim, the performance of the service is so deficient that ... it is the equivalent of no performance at all"); *cf. Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732 (7th Cir.1999) (drawing distinction between no testing and ineffective testing for purposes of FCA liability).

### C. *False Certification*

██ Swan's claim fares no better under a false certification theory. Some courts have held that submitting Medicare or Medicaid claims for services that fail to meet the relevant statutory standard of care can constitute actionable fraud under the FCA. *See United States v. NHC Healthcare Corp.*, 115 F.Supp.2d 1149 (W.D.Mo.2000); *United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, Inc.*, 945 F.Supp. 1485 (W.D.Okla.1996). However, these questionable holdings have not been adopted by the Ninth Circuit or any other appellate court. The prevailing law is that "regulatory violations do not give rise to a viable FCA action" unless government payment is expressly conditioned on a false certification of regulatory compliance. *See Anton*, 91 F.3d at 1266 ("[i]t is the false *certification* of compliance which creates liability [under the FCA] when certification is a prerequisite to obtaining a government benefit") (emphasis in original); *Lum v. Vision Service Plan*, 104 F.Supp.2d 1237, 1242 (D.Haw.2000) ("[a]bsent express false certifications upon which funding is conditioned, the False Claims Act provides no remedy"). Swan has introduced no evidence to demonstrate that Covenant Care certified compliance with the applicable Medicare regulations as prerequisite to receiving federal payment.[12]

---

**12.** Due to the absence of an explicit false certification, Swan's § 3729(a)(2) claim is

tantamount to the same implied certification

Moreover, under the Social Security Act, the Department of Health and Human Services ("HHS") can impose a variety of sanctions on nursing homes for failure to meet quality of care guidelines, including civil monetary penalties, temporary government management of the facility, denial of payment, or termination of the right to participate in Medicare programs. *See* 42 U.S.C. § 1395i–3(h)(2)(B); *Vencor Nursing Centers v. Shalala*, 63 F.Supp.2d 1, 8 (D.D.C.1999).[13] HHS may also exercise discretion not to impose sanctions in a particular case. *See* 42 U.S.C. § 1395i–3(h)(2)(A).

The Social Security Act establishes a regime in which the Secretary of HHS ("Secretary") is directed to consider various factors in determining whether to sanction a non-compliant nursing home. *See* 42 C.F.R. 488.404 (2001)(factors to be considered in selecting remedies). The Act further grants the Secretary considerable discretion in deciding which remedy or sanction to pursue. *See* 42 U.S.C. § 1395i–3(h)(2)(A) (Secretarial authority to impose sanctions). Denial of payment is only one of several alternative remedies that may be imposed for a skilled nursing facility's failure to provide adequate patient services—not an automatic penalty assessed whenever a regulatory violation occurs. *See* 42 U.S.C. § 1395i–3(h)(2)(B)(i).

To allow FCA suits to proceed where government payment of Medicare claims is not conditioned on perfect regulatory compliance—and where HHS may choose to waive administrative remedies, or impose a less drastic sanction than full denial of payment—would improperly permit qui tam plaintiffs to supplant the regulatory discretion granted to HHS under the Social Security Act, essentially turning a discretionary denial of payment remedy into a mandatory penalty for failure to meet Medicare requirements. *See Anton*, 91 F.3d at 1267 (where regulatory compliance is "not a *sine qua non* [for the] receipt of state funding" the FCA may not be used as a substitute for administrative remedies); *Lamers*, 168 F.3d at 1020 (qui tam plaintiff may not use the FCA to "preempt" a federal agency's "discretionary decision not to pursue regulatory penalties").

### D. Conclusion

Assuming that Swan's allegations of records falsification and under-staffing at Emerald Gardens are true, Covenant Care is still entitled to summary judgment on her qui tam claim, because Swan has failed to demonstrate how such regulatory violations create FCA liability.[14] Under the circumstances of this case, the FCA does not supply a remedy. However, other forms of relief are available to nursing home patients and their family members in cases of serious neglect. *See, e.g.,* Cal. Welf. and Inst.Code § 15600 *et seq.* (Cali-

theory of FCA liability that the court has previously rejected in this case. (Feb. 22, 2001 Order at 3 n. 1).

**13.** "Prior to 1987 the only available remedies [for a nursing home's violation of Medicare requirements] were outright termination or a blanket ban on reimbursement for care of newly admitted residents ... In 1987 Congress enacted the Federal Nursing Home Reform Act, which added a greater variety of remedies to the Medicare and Medicaid Acts ... establish[ing] categories of non-compli-

ance and provid[ing] a number of possible remedies for HHS to choose from based on the severity of the alleged noncompliance." *Vencor*, 63 F.Supp.2d at 8 (citing 42 U.S.C. §§ 1395i–3(h)(2), 1396r(h)(3)).

**14.** Because Covenant Care's motion for summary judgment is granted on the ground that Swan has failed to state a claim under a cognizable theory of FCA liability, the court will not address the other arguments raised in Covenant Care's motion.

fornia Elder Abuse Act). HHS also bears responsibility for correcting severe nursing home abuses that "jeopardize the health or safety" of nursing home residents. *See* 42 U.S.C. §§ 1395i–3(f), § 1395i–3(h)(2)(A)(i).

## IV.

For the reasons stated above, defendant's motion to dismiss for lack of subject matter jurisdiction is GRANTED. Defendants' motion for summary judgment is also GRANTED in the alternative.

Judgment shall enter for defendants.

IT IS SO ORDERED.