# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 9, 2014

Docket No. 31,682

STATE OF NEW MEXICO ex rel.
GARY K. KING, ATTORNEY GENERAL,

      Plaintiff-Appellant,

v.

BEHAVIORAL HOME CARE, INC.,
a New Mexico corporation,

      Defendant-Appellee.

APPEAL FROM THE DISTRICT COURT OF BERNALLILO COUNTY
C. Shannon Bacon, District Judge

Gary K. King, Attorney General
Santa Fe, NM
Amy Landau, Assistant Attorney General
Albuquerque, NM

for Appellant

Davis & Gilchrist, P.C.
Bryan J. Davis
Albuquerque, NM

for Appellee

Bannerman & Johnson, P.A.
Deborah E. Mann
Albuquerque, NM

for *Amicus Curiae* New Mexico Association
for Home and Hospice Care

## OPINION

**GARCIA, Judge.**

**{1}** The New Mexico Attorney General's Medicaid Fraud Control Unit brought action on behalf of the State against Behavioral Home Care, Inc. (BHC) alleging violations of the New Mexico Medicaid Fraud Act (the MFA), NMSA 1978, §§ 30-44-1 to -8 (1989, as amended through 2004), and breach of contract. The issue before this Court involves whether the district court correctly dismissed the State's claims against BHC for failure to state a claim upon which relief can be granted. *See* Rule 1-012(B)(6) NMRA.

**{2}** The State alleged that BHC's billing for Personal Care Option (PCO) services provided by certain caregivers for whom BHC had not fully complied with the Caregivers Criminal History Screening Act (CCHSA), NMSA 1978, §§ 29-17-2 to -5 (1998, as amended through 2005), constituted false, fraudulent, or excess payments under the MFA. The State further alleged that the same failure to comply with CCHSA screening requirements constituted a breach of contract by BHC. The State requested relief pursuant to Section 30-44-8 in the form of a recovery for any overpayments, civil penalties for each overpayment, civil penalties for each false representation, attorney fees, interest, and costs. In the two orders now being appealed by the State, the district court dismissed all of the State's claims.

**{3}** While the MFA provides the vehicle for suit, federal Medicaid statutes and regulations define the requirements for Medicaid claims. To participate in the Medicaid program, federal law requires home healthcare providers to comply with all applicable federal, state, and local laws and regulations. *United States ex rel. Joslin v. Cmty. Home Health of Md., Inc.*, 984 F. Supp. 374, 376 (D. Md. 1997); *see* 42 U.S.C. § 1395bbb(a)(5) (2006); 42 C.F.R. § 484.12(a) (2012). It is BHC's compliance with the CCHSA that forms the primary basis for the dispute in this case. As we address in detail below, not all compliance issues translate into liability or fraud under the MFA. We hold that failure to comply with the CCHSA regulations does not support MFA liability in this case and affirm the district court's dismissal of the State's claims.

**BACKGROUND**

**{4}** "Congress created the Medicaid program in 1965 to supplement the Social Security Act." *Starko, Inc. v. Presbyterian Health Plan, Inc.*, 2012-NMCA-053, ¶ 4, 276 P.3d 252, *cert. granted*, 2012-NMCERT-003, 293 P.3d 184. "The program provides medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and compels participating states to share the costs of administering the program with the federal government." *Id.* (internal quotation marks and citation omitted). "New Mexico is a participant state." *Id.* The New Mexico Human Services Department (HSD) is charged with administering Medicaid and maintaining a "statewide, managed care system to provide cost-efficient, preventive, primary[,] and acute care for [M]edicaid recipients." NMSA 1978, § 27-2-12.6(A) (1994); *see Starko*, 2012-NMCA-053, ¶ 28.

2

**{5}** In order to function as a Medicaid service provider, BHC executed a contract known as an HSD Medical Assistance Division (MAD) 335 Provider Participation Agreement (PPA). The PPA is a payment related form signed by BHC and HSD that specifically states, "BY SIGNATURE, [BHC] AGREES TO ABIDE BY AND BE HELD TO ALL FEDERAL, STATE, AND LOCAL LAWS, RULES, AND REGULATIONS, INCLUDING, BUT NOT LIMITED TO THOSE PERTAINING TO MEDICAID AND THOSE STATED HEREIN." BHC also contracted with HSD as part of the Aging and Long Term Services Department Disabled and Elderly Waiver Program to provide in-home PCO caregiver services for elderly and disabled Medicaid recipients. BHC agreed in its Medicaid contracts to provide and submit reimbursement claims for Medicaid funded services to the Medicaid eligible population in accordance with all applicable state and federal Medicaid laws and the regulations and standards of the New Mexico Medicaid Program, including, without limitation, the CCHSA. *See* §§ 29-17-2 to -5; 7.1.9.1 to .11 NMAC (01/01/2006) (screening requirements); 8.351.2.9 to .12 NMAC (07/01/2003, amended 01/01/2014) (sanctions and remedies).

**{6}** The New Mexico Legislature enacted the CCHSA "to ensure to the highest degree possible the prevention of abuse, neglect[,] or financial exploitation of care recipients," including Medicaid recipients, by caregivers who provided "direct care or routine and unsupervised physical or financial access to any care recipient served by that provider[.]" Sections 29-17-3, -4(B). It provides that a care provider may not employ a caregiver unless the caregiver has first submitted to a request for a nationwide criminal history screening. Section 29-17-5(C). The screening requirement applies to caregivers who would provide services to any patient, not just Medicaid patients, irrespective of whether the patient paid out of pocket or with private insurance. Section 29-17-4(B), (D). Statutory compliance only requires submission of the caregiver's criminal history application, not receipt of screening results, prior to billing for the PCO caregiver services. Section 29-17-5(E). Should a caregiver have a disqualifying criminal conviction in his or her history, the CCHSA provides for a reconsideration procedure. Section 29-17-5(F). During the pendency of the reconsideration period, the caregiver may continue to provide caregiver services on behalf of the healthcare provider. *Id.*

**{7}** The New Mexico Legislature enacted the MFA and provided both a definition for Medicaid fraud in Section 30-44-7(A) and also made the falsification of documents a fourth degree criminal offense under Section 30-44-4. Pertinent to this case, Medicaid fraud "consists of: . . . presenting or causing to be presented for allowance or payment with intent that a claim be relied upon for the expenditure of public money any false, fraudulent, excessive, multiple[,] or incomplete claim for furnishing treatment, services[,] or goods[.]" Section 30-44-7(A)(3). Falsification of documents "consists of:

> . . . knowingly making or causing to be made a misrepresentation of a material fact required to be furnished under the program or knowingly failing or causing the failure to include a material fact required to be furnished under the [Medicaid] program in any record required to be retained in connection

3

with the program pursuant to the [MFA] or regulations issued by the department for the administration of the program, or both; or . . . knowingly submitting or causing to be submitted false or incomplete information for the purpose of receiving benefits or qualifying as a provider."

Section 30-44–4(A).

{8}     Between approximately April 2004 and July 2009, BHC electronically submitted over 1,800 PCO billing claims for services provided by certain caregivers whose criminal history screening applications had not been submitted as required by the CCHSA (the Unscreened Caregivers). BHC submitted its Medicaid reimbursement claims pursuant to an Electronic Claim Submission Agreement (the Electronic Agreement). The Electronic Agreement required BHC to "acknowledge[] that claims will be paid from [f]ederal and [s]tate funds" and that "anyone who misrepresents or falsifies" any information relating to a claim may be subject to a fine and/or imprisonment under federal and state law. By submitting a claim electronically, BHC was also required to agree that the claim contained "true, accurate, and complete information" and that "[t]he cashing of each check attached to each Remittance Advice [was] a representation and certification that [BHC] represented the claim for services . . . and that the services were rendered . . . ." BHC was not required to expressly certify compliance with all Medicaid contractual provisions or all applicable state and federal regulations in order to submit the Electronic Agreement.

{9}     The State asserts two MFA causes of action against BHC as a result of its billing claims for the services provided by the Unscreened Caregivers. First, the State maintains that BHC's PCO claims for the Unscreened Caregivers' services constituted falsification of documents as defined in MFA Section 30-44-4(A) and/or Medicaid fraud under Section 30-44-7(A). The State specifically alleges that each claim for payment prior to the completion of the Unscreened Caregivers' criminal history screening was a false or fraudulent claim under these two statutory provisions. The State's second cause of action maintains that BHC's PCO payment claims for the Unscreened Caregivers' services were in breach of BHC's MAD 335 PPA contracts with HSD. The State argues that it was entitled to recover the 1,800 PCO claims submitted for the Unscreened Caregivers' services as overpayments and civil penalties under Section 30-44-8(A) of the MFA.

{10}     The district court dismissed both of the State's claims for failure to state a claim upon which relief can be granted. *See* Rule 1-012(B)(6). Its first order granted BHC's Rule 1-012(B)(6) motion to dismiss the State's first cause of action (statutory recovery of Medicaid overpayments under the MFA). The court held that the State may not recover the claimed MFA overpayments in addition to a claim for the recovery of civil penalties under Section 30-44-8(A)(2). The district court determined that Section 30-44-7(A)(3) was the only applicable liability provision that required BHC to comply with the CCHSA and its regulations prior to billing Medicaid for in-home caregiver services. It explained, however, that BHC's non-compliance with the CCHSA and its regulations was not actionable under the MFA because submission of criminal history screening applications for Medicaid

4

caregivers was a "condition[] of participation in Medicaid" rather than a "condition[] of [Medicaid] payment." The district court's second order granted BHC's Rule 1-012(B)(6) motion to dismiss the State's amended cause of action (breach of contract for Medicaid overpayments). Because the Medicaid regulations were not applicable to the State's claims, the district court reviewed BHC's breach of contract claim under the common law. The court determined that the State failed to state a claim for relief under Rule 1-012(B)(6) because of its failure to allege facts that would support any recoverable damages for breach of contract.

**STANDARD OF REVIEW**

**{11}** A Rule 1-012(B)(6) motion tests the legal sufficiency of a party's allegations, so we review de novo a district court's granting of such a motion. *Padwa v. Hadley*, 1999-NMCA-067, ¶ 8, 127 N.M. 416, 981 P.2d 1234; *see Padilla v. Wall Colmonoy Corp.*, 2006-NMCA-137, ¶ 7, 140 N.M. 630, 145 P.3d 110 (recognizing that "a Rule 1-012 B)(6) motion tests the legal sufficiency of the complaint, not the facts that support it" (internal quotation marks and citation omitted)). If a plaintiff is not entitled to recover under any theory of the facts alleged in the complaint, it is appropriate to grant a motion for dismissal under Rule 1-012(B)(6). *Padilla*, 2006-NMCA-137, ¶ 7. On appeal we accept as true all well-pleaded factual allegations and resolve all doubts in favor of the sufficiency of the complaint. *Padwa*, 1999-NMCA-067, ¶ 8.

**{12}** Our analysis requires us to review the district court's interpretation of the MFA. Questions of statutory interpretation are reviewed de novo on appeal. *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105. In discerning the Legislature's intent, "we are aided by classic canons of statutory construction" and "look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.* ¶ 20. "When statutory language is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Anadarko Petroleum Corp. v. Baca*, 1994-NMSC-019, ¶ 9, 117 N.M. 167, 870 P.2d 129 (internal quotation marks and citation omitted). Only if an ambiguity exists will we proceed further in our statutory construction analysis. *See State v. Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933 ("Unless ambiguity exists, [the appellate courts] must adhere to the plain meaning of the [statutory] language.").

**DISCUSSION**

**I.      MFA Overpayment and Penalty Claims**

**{13}** We first address the district court's rulings that the State's statutory claims for civil penalties and overpayments were not legally sufficient under the MFA. The State argues that BHC violated the MFA because of an implied certification that should be recognized under New Mexico law and an alleged violation of the terms of BHC's Medicaid contracts when

5

it submitted the Electronic Agreement for the payment of the services provided by the Unscreened Caregivers. The State asserts that BHC knew the Unscreened Caregivers' services did not comply with New Mexico CCHSA requirements and that it was in breach of the MAD 335 PPA contracts. The legal issue raised by this allegation is whether BHC's failure as a Medicaid provider to comply with certain CCHSA screening application requirements constitutes billing and payment fraud under the MFA and exposes BHC to liability under the MFA. This legal issue arises as a matter of first impression in New Mexico.

## 1. Applicable Liability Provisions Under the MFA

**{14}** As a preliminary matter, we first address the applicability of the State's attempt to impose MFA liability under Section 30-44-4(A) for falsification of documents and under Section 30-44-7(A) for Medicaid fraud. In the proceedings below, the district court determined that Section 30-44-7(A)(3) was the only liability provision in the MFA that was "potentially applicable" to the State's argument. Although the State summarily argues on appeal that BHC's conduct also violated Section 30-44-4(A) of the MFA, it failed to then develop a substantive or legally articulate challenge to the district court's determination that Section 30-44-4 was inapplicable to its claims. We decline to address this inarticulate argument addressing Section 30-44-4(A). *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("It is of no benefit either to the parties or to future litigants for [the appellate courts] to promulgate case law based on our own speculation rather than the parties' carefully considered arguments."). We will therefore consider the State's argument only as it pertains to Medicaid fraud under Section 30-44-7(A)(3) of the MFA.

## 2. Liability for Medicaid Fraud Based on a Regulatory Violation Alone

**{15}** The State alleges that BHC committed Medicaid fraud because it received payments for services that it knew were not provided in compliance with state licensing laws and regulations. To avoid dismissal of this allegation, the State must establish that BHC (1) presented false or fraudulent claims for payment to HSD, and (2) that BHC intended for HSD to rely on the false or fraudulent claims for purposes of reimbursement. *See* § 30-44-7(A)(3) (defining Medicaid fraud as "presenting or causing to be presented for allowance or payment with intent that a claim be relied upon for the expenditure of public money any false, fraudulent, excessive, multiple[,] or incomplete claim for furnishing treatment, services[,] or goods"). It is not necessary to address the intent element of the statute on appeal. The question we address is whether regulatory compliance with the CCHSA was a material condition of HSD payment for the Medicaid services, and therefore, whether alleging that BHC submitted false certifications of regulatory compliance for the purpose of receiving HSD payments states a claim for relief under Section 30-44-7(A)(3).

**{16}** Although this issue is novel, we are not without guidance. With respect to the statutory language at issue in this litigation, pursuing Medicaid fraud under the MFA is substantively similar to claims pursued under the federal False Claims Act (FCA). *See* 31

6

U.S.C. § 3729(a)(1)(A) (2006) (creating civil liability for any person who "knowingly presents, or causes to be presented" to the government "a false or fraudulent claim for payment or approval"); *see also* Pamela Bucy et al., *States, Statutes, & Fraud: A Study of Emerging State Efforts to Combat White Collar Crime*, 31 Cardozo L. Rev. 1523, 1535 (2010) (noting that many states' false claims statutes were passed in recent years, spurred by Congress' "financial incentive for states to pass FCAs that mirror the federal FCA"). Given this analogous language, both parties have relied on federal case law interpreting the meaning of a false or fraudulent claim under the federal FCA.

**{17}** To address whether the State has identified Medicaid fraud as defined by Section 30-44-7(A)(3), we shall also reference case law interpreting the meaning of a false or fraudulent claim under the FCA. New Mexico does not necessarily follow federal precedent in every instance. *See Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 23, 135 N.M. 539, 91 P.3d 58 ("Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." (internal quotation marks and citation omitted)); *Charles v. Regents of N.M. State Univ.*, 2011-NMCA-057, ¶ 15, 150 N.M. 17, 256 P.3d 29 (noting that our appellate courts look to federal decisions for guidance but emphasizing that we have not adopted, wholesale, federal decisions that may be helpful in deciding a particular case). The federal cases referenced by the parties in this case have provided helpful guidance.

**{18}** "The FCA recognizes two types of actionable claims—factually false claims and legally false claims." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008). A factually false claims case is relatively straightforward, arising where the government payee has submitted reimbursement claims for unnecessary services or those that were never provided. *Id.* By contrast, a claim based on an alleged legal falsehood arises where the government payee "has certified compliance with a statute or regulation as a condition to government payment, yet knowingly failed to comply with such statute or regulation." *Id.* (emphasis, alteration, internal quotation marks, and citation omitted). In this case, the State does not assert that BHC billed for services that were not rendered or necessary—a factually false claim. Instead, the State raises a claim based on a legal falsehood. The State claims that BHC impliedly submitted a legally false claim because it attempted to collect payment from the government for services provided by the Unscreened Caregivers who it knew were not in compliance with the CCHSA screening application requirements. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (explaining that an implied false certification claim under the FCA "is premised on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment" (internal quotation marks and citation omitted)).

**{19}** The State essentially argues that because BHC once certified that it complied with all state regulations to originally qualify as a Medicaid home healthcare provider and facility, BHC is continually liable under the MFA for each failure to later adhere to all the original certification requirements and regulations. BHC concedes that it "must comply with a host

7

of regulations contained in 8.315 [NMAC], including the performance of criminal history screening on prospective caregivers" in order to participate as a provider of PCO services. However, BHC contends that violations of state qualification and licensing regulations are not actionable under the MFA, even where a healthcare provider certifies compliance with all state laws, because Medicaid reimbursement is not conditioned on compliance with all such regulations. We agree.

**{20}** The success of a legally false certification claim under the FCA depends on whether it is based on "conditions of participation" in the Medicare program (which do not support an FCA claim) or on "conditions of payment" from Medicare funds (which do support FCA claims). *Wilkins*, 659 F.3d at 309; *Conner*, 543 F.3d at 1220; *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701-02 (2d Cir. 2001). The claim will fail unless compliance with the allegedly violated state law or regulation is a condition of the government's payment of the claim. *See, e.g.*, *Mikes*, 274 F.3d at 697; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266-67 (9th Cir. 1996); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 720 (N.D. Tex. 2011); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 459 F. Supp. 2d 1081, 1086 (D. Kan. March 4, 2006). "A violation concerns a condition of payment if such violation might cause the government to actually refuse payment." *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 147 (E.D. Pa. 2012) (alteration, internal quotation marks, and citation omitted); *see Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) ("[I]t is not the violation of a regulation itself that creates a cause of action under the FCA. Rather, noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment."); *see also United States ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp. 2d 972, 978 (W.D. Tenn. 2007) ("Conditions of [p]articipation are quality of care standards directed toward[] an entity's continued ability to participate in the Medicare program rather than a prerequisite to a particular payment.").

**{21}** Though we have yet to address the viability of an implied false certification claim under the MFA, we consider the federal precedent instructive. Like the FCA, Section 30-44-7(A)(3) imposes a materiality element which requires that the false or fraudulent certification be integral to the government's payment decision. On appeal, we recognize that the State does not dispute this materiality requirement. Rather, it argues that the federal distinction between conditions of payment and conditions of participation is irrelevant in this case because BHC's certification of CCHSA compliance was both a material prerequisite for participation in the Medicaid program and a condition of Medicaid reimbursement and payment. *See Conner*, 543 F.3d at 1222 ("[S]ome regulations or statutes may be so integral to the government's payment decision as to make any divide between conditions of participation and conditions of payment a distinction without a difference." (internal quotation marks and citation omitted)).

**{22}** The State cites *New York v. Amgen Inc.*, 652 F.3d 103, 115 (1st Cir. 2011), to support its assertion that CCHSA compliance should be considered a condition of Medicare payment

because such compliance is a mandatory prerequisite to ever receiving payment. *Amgen* is readily distinguishable from the instant case. The *Amgen* case involved false and fraudulent claims to state Medicaid agencies that arose from alleged kickbacks to healthcare providers. *Id.* at 105. Kickbacks are specifically recognized as a form of fraud in the provider participation agreements signed by healthcare providers. *Id.* at 114 (citing NMSA 1978, § 27-11-3(B)(6), (C)(3)). In *Amgen* it was unnecessary for the federal court to distinguish between conditions of payment and conditions of participation because the contract provisions at issue explicitly identified the fraudulent kickback conduct as a condition of Medicaid payment. 652 F.3d at 115 ("[T]he New Mexico agreement requires providers to acknowledge that non-compliance with anti-kickback laws vitiates a provider's ability to get its claims paid.").

**{23}** More significantly, the *Amgen* holding must also be reconciled with the well-established principle that the FCA is not a vehicle for regulatory compliance. *See, e.g.*, *Hopper*, 91 F.3d at1267; *see also United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."). Thus, the overwhelming majority of courts have held that a violation of the underlying statute or regulation by itself does not create a false certification cause of action under the FCA. *See United States v. McNinch*, 356 U.S. 595, 599 (1958) (addressing an application for credit insurance and recognizing that the FCA "was not designed to reach every kind of fraud practiced upon the [g]overnment"); *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 501 (S.D. Tex. 2003) ("A general statement of adherence to all regulations or statutes governing participation in a program through which federal funds are received is insufficient as a basis of [FCA] liability."); *see also Wall*, 778 F. Supp. 2d. at 720 ("A sustainable FCA allegation premised on a false certification of compliance with statutory or regulatory requirements must be based upon a 'condition of payment,' not a 'condition of participation.' "). This reluctance to expand the intended scope of the FCA is particularly evident where a government payee has failed to comply with state regulations like the CCHSA screening requirement at issue here. *See United States ex rel. Swan v. Covenant Care, Inc.*, 279 F. Supp. 2d 1212, 1221 (E.D. Cal. 2002) ("The prevailing law is that regulatory violations do not give rise to a viable FCA action unless government payment is expressly conditioned on a false certification of regulatory compliance." (internal quotation marks and citation omitted)). The federal courts have repeatedly held that regulatory deficiencies that are not material to government payment do not support a false claim action. *Id.* (explaining that only two district courts "have held that submitting Medicare or Medicaid claims for services that fail to meet the relevant statutory standard of care can constitute actionable fraud under the FCA" and  that "these questionable holdings have not been adopted by the Ninth Circuit or any other appellate court"); *see United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000) (noting that "all courts of appeals to have addressed the matter, [hold] that a false certification of compliance with a statute or regulation cannot serve as the basis for a qui tam action under the FCA unless payment is conditioned on that certification" (emphasis omitted)); *see, e.g.*, *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379, 382 (5th Cir. 2003); *Lamers*, 168 F.3d at 1016-17,

9

1020.

**{24}** Public policy recognizes that the failure to strictly comply with a regulatory scheme as complicated as the MFA or the FCA does not always provide grounds for a fraudulent payment suit, especially without taking into account the nature of the noncompliance or the material aspects of the regulation. *See Conner*, 543 F.3d at 1221 ("[A]lthough the government considers substantial compliance a condition of ongoing Medicare *participation*, it does not require perfect compliance as an absolute condition to receiving Medicare *payments* for services rendered."); *Hoppe*r, 91 F.3d at 1267. Adoption of the State's theory of implied compliance could have a broad impact on all providers of Medicaid services. For this reason, courts addressing compliance issues under the FCA have not supported such an expansive interpretation of liability. As a result, we will not automatically conclude that every request for payment accompanied by a statement of compliance with all applicable regulations is material to the government's subsequent payment to the provider and thereby actionable as Medicaid fraud under the MFA.

**{25}** An alleged violation of a state Medicaid licensing regulation does not automatically render a Medicaid provider ineligible to receive Medicaid payments. The MFA does not support such expansive liability in the absence of an underlying statute or regulation that conditions payment on compliance with the certification. Absent this requirement, the MFA could turn "into a blunt instrument to enforce compliance with all . . . regulations [rather than] only those regulations that are a precondition to payment." *Wilkins*, 659 F.3d at 307 (omission in original) (internal quotation marks and citation omitted). The mere fact that BHC violated the statutory hiring requirements outlined by the CCHSA does not automatically create a violation of a condition of Medicaid payment that supports a Medicaid fraud cause of action under the MFA. Instead, the appropriate framework for resolving Medicaid fraud false certification issues is to examine whether the defendant's compliance with the statutes and regulations in question was a condition to receiving payment from the government. *Hopper*, 91 F.3d at 1266-68; *see also Thompson*, 125 F.3d at 902-03 (holding that the FCA is implicated where the government conditions payment upon the certification of compliance with regulations); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 985 (E.D. Wis. 1998) (The "key inquiry is whether the claim in question has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." (internal quotation marks and citation omitted)). Accordingly, the success of the State's appeal depends on whether compliance with the CCHSA was a condition of HSD payment for services rendered by BHC.

### 3. Failure to Comply with CCHSA Screening Requirements

**{26}** In the instant case, the State asserts that HSD payment was conditioned on BHC billing for services conducted by "qualified" caregivers—those who had been hired in compliance with CCHSA screening requirements. It asserts that HSD would not have paid BHC for services provided by the Unscreened Caregivers had it known that they were not

10

"qualified" under the terms of the CCHSA. But, a disqualifying criminal history under the CCHSA does not automatically affect the caregiver's qualifications to provide caregiver services. Section 29-17-5(F) (allowing for continued employment of a disqualified caregiver and reconsideration of a disqualifying conviction during the subsequent reconsideration proceedings). The State has neither alleged any facts to support an argument that the Unscreened Caregivers provided a level of care that violated reasonable healthcare standards or requirements, nor that care from the Unscreened Caregivers resulted in the "abuse, neglect[,] or financial exploitation of care recipients." Section 29-17-3. While the State asserts that BHC had a policy of employing "unqualified" caregivers, the State could not allege that HSD would have been entitled to withhold payment solely because the Unscreened Caregivers had disqualifying criminal convictions in their histories.

{27}    Even when a care provider has expressly certified compliance with all state regulations, the New Mexico Medicaid regulations make clear that not every regulatory deficiency constitutes actionable false or fraudulent conduct under the MFA. *See* 8.351.2.11 NMAC. For example, the statutes and regulations allow, but do not require, HSD to sanction a provider for non-fraudulent misconduct, including a violation of the CCHSA. Section 29-17-5(L); 8.351.2.11 NMAC. If HSD determines that termination from the Medicaid program is the appropriate sanction for a provider's non-compliance with a condition of participation, it must allow the provider notice and an opportunity to correct the identified misconduct before termination. *See* 8.351.2.9 NMAC; 8.31.2.10(B)(1), (3) NMAC; *see also* 42 C.F.R. § 488.28 (2013) (granting a care provider a reasonable time to achieve compliance with conditions of participation); *Mikes*, 274 F.3d at 702 ("The fact that [the statute] permits sanctions for a failure to maintain an appropriate standard of care only where a dereliction occurred in 'a substantial number of cases' or a violation was especially gross and flagrant makes it evident that the section is directed at the provider's continued eligibility in the Medicare program, rather than any individual incident of noncompliance." (alterations, internal quotation marks, citation omitted)); *Hopper*, 91 F.3d at 1267 (holding that the FCA may not be used as a substitute for administrative remedies where regulatory compliance is "not a *sine qua non* [for the] receipt of state funding"). The regulations require HSD to impose the ultimate sanction of termination when a "provider has a previous suspension from [Medicaid] with failure to correct identified deficiencies[,]" or immediately when a provider is convicted of Medicare fraud. 8.351.2.11(E)(1)(a), (b) NMAC. The fact that HSD may choose to institute a plan of correction or other alternative sanctions before addressing the provider's participation in the program makes it evident that the MFA does not require perfect compliance at all times with regulatory standards such as those instituted by the CCHSA. *See Conner*, 543 F.3d at 1220-21 (recognizing that provider noncompliance with the FCA does not immediately suspend Medicare payments unless such noncompliance is a recognized condition of payment); *see also United States ex rel. N.M. v. Deming Hosp. Corp.*, ___ F. Supp. 2d. ___, 2013 WL 7046410, at *7, 9 (D.N.M. Nov. 2013) ("[A]lthough the government considers substantial compliance [with applicable regulations] a condition of ongoing Medicare participation, it does not require perfect compliance as an absolute condition of receiving Medicare payments for services rendered." (internal quotation marks and citation omitted)).

11

**{28}**     The State's position that compliance with the CCHSA requirements is an implied condition of payment is only possible by weaving together isolated phrases from several sections in a complex system of Medicaid regulation. This creative approach to implied compliance is not supported by the structure of the statutory or regulatory scheme. To the contrary, CCHSA permits providers to employ a caregiver with a disqualifying criminal history during the pendency of an administrative reconsideration and, even after reconsideration, if "the conviction does not directly bear upon the applicant's, caregiver's[,] or hospital caregiver's fitness for the employment." Section 29-17-5(F). Strict compliance cannot be reconciled with these exceptions allowed under CCHSA.

**{29}**     The State has correctly identified certain caregiver qualification deficiencies that are recognized as preconditions for Medicaid payment. These deficiencies include the lack of necessary caregiver certifications and inadequate training. However, nothing in the State's complaint alleges that there were any deficiencies with the certifications or training of the Unscreened Caregivers. The State merely argues that—by virtue of BHC's failure to submit criminal history screenings prior to billing—the Unscreened Caregivers were not fully qualified to perform Medicaid services.

**{30}**     Unlike failures to meet minimum certification and training requirements to adequately perform caregiving services, the State has presented no authority that the criminal background screenings required by CCHSA constitute an equivalent performance-based deficiency that must be recognized as a condition of payment. *See Mikes*, 274 F.3d at 697 ("Since the [FCA] is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay."); *see also State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (emphasizing that where a party "cites no authority from any jurisdiction supporting [its] argument, [then the appellate courts] may conclude that no such authority exists"). BHC's compliance with CCHSA thus raises only one serious question—whether BHC fell below the requirements for Medicaid participation as a qualified provider. Because BHC was recognized as a qualified provider at the time it was paid for the services provided by the Unscreened Caregivers, its qualified provider status is not at issue in these proceedings. The State was not pursuing a termination of BHC's participation as a qualified provider. Accordingly, there is no evidence that Medicaid provider payments were conditioned upon compliance with CCHSA regulations. We conclude that BHC's practice of failing to comply with CCHSA was not in violation of the MFA as a condition for payment of Medicaid services. Accordingly, we affirm the district court's ruling on this issue.

### 4.      Section 30-44-8(A) Overpayments

**{31}**     We now address the State's contention that the district court erred when it held that the State could not seek the remedy of reimbursement of Medicaid overpayments under Section 30-44-8(A). The State asserts that "[t]he plain language of Section 30-44-8(A) requires consideration regarding whether BHC received program payments in violation of the MFA." We have already concluded that BHC's failure to comply with CCHSA

regulations was not actionable under the MFA. As such, Section 30-44-8(A) is equally inapplicable to the State's claims and does not provide a separate statutory basis for recovery of alleged overpayments. *See* § 30-44-8(A) (creating liability for payments obtained "by reason of a violation of the [MFA]"). For this reason, we need not address at this time whether the MFA provides for civil recovery of Medicaid overpayments in addition to other penalties provided by law.

## II.    Breach of Contract Claims

**{32}**    The State also appeals the district court's Rule 1-012(B)(6) dismissal of its breach of contract claims against BHC. The State alleged that BHC breached its MAD 335 PPA by filing Medicaid claims and retaining the Medicaid payments for services rendered to patients by the Unscreened Caregivers. While it is true that BHC's failure to submit the required criminal screening requests for the Unscreened Caregivers constituted a breach of its MAD 335 PPA contract, the real issue on appeal is whether the State sought any remedy for this breach that is allowed by the law. The State challenges the district court's application of UJI 13-843 NMRA to its breach of contract claim.

**{33}**    We have already concluded that the district court correctly found that the State failed to allege facts that would support any recoverable damages under federal and state Medicaid regulatory schemes. Thus, the only remedy available for the State's breach of contract claim is provided under the common law. *See* UJI 13-822 NMRA. But the purpose of allowing damages for a common law breach of contract is to restore to the injured party what was lost by the breach and what he or she reasonably could have expected to gain had there been no breach. UJI 13-843. Accordingly, BHC sought dismissal by the district court, arguing that "the State has suffered no damages as a result of BHC's billing . . . for services rendered" by the Unscreened Caregivers. BHC's motion for dismissal questioned the State's ability to recover in damages "money that it paid for services it actually received." In response, the State argued that it did not waive any rights to recover damages for breach of contract under the MFA. However, it did not address BHC's argument that the State could not "support any actual damages in contract based upon BHC's conduct of billing for [the U]nscreened [C]aregivers' services."

**{34}**    The State in this case pursued only a reimbursement remedy under the MFA that is inapplicable under the facts of the case. Even though BHC breached its MAD 335 PPA contract, its allegedly false certifications were, under the MFA circumstances of this case, not legally material to HSD's ongoing decision to pay BHC for services provided by the Unscreened Caregivers. If the State wished to contest the accuracy of BHC's statement in its motion to dismiss, that the State suffered no recoverable damages as a result of BHC's breach of contract, then the State was required to so by identifying a basis that entitled it to relief. *See Hovet v. Lujan*, 2003-NMCA-061, ¶ 8, 133 N.M. 611, 66 P.3d 980. Although the record indicates that the State filed a brief in opposition to BHC's motion to dismiss, it did not contest BHC's statement that the State could not recover damages for services that it actually received or otherwise establish that the pleadings told "a story from which the

essential elements [that are a] prerequisite to the granting of the relief sought can be found or reasonably inferred." *Derringer v. State*, 2003-NMCA-073, ¶ 5, 133 N.M. 721, 68 P.3d 961 (omissions, internal quotation marks, citation omitted). Other jurisdictions recognize that in the absence of pleading allegations sufficient to establish recoverable damages or relief that might be granted, the plaintiff may not defeat a motion to dismiss. *See Aimis Art Corp. v. N. Trust Secs., Inc.*, 641 F. Supp. 2d 314, 319 (S.D.N.Y. 2009); *see also Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166 (Ill. App. Ct. 2009); *Greenwald v. Burns & Levinson, LLP*, 1 N.E.3d 294 (Mass. App. Ct. 2014) (non-precedential). Because the sole remedy sought by the State for BHC's breach of contract was based on inapplicable reimbursement provisions of the MFA, the district court did not err when it ruled in favor of BHC on the State's breach of contract claim that alleged no other damages that were recoverable.

**{35}** The MFA is essential to policing the integrity of the State's dealings with those to whom it pays money. At the same time, the federal penalties afforded by the FCA are not interchangeable with remedies for ordinary breaches of contract claims. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (addressing factual issues for summary judgment but noting and distinguishing the nature of FCA claims and remedies from ordinary breach of contract claims). While we do not condone a care provider's alleged failure to adhere to CCHSA requirements, the State has failed to allege common law contract remedies or damages where it incurred no identified harm to PCO patients and enjoyed the benefit of the BHC's services that were provided. Liability cannot be imposed absent an alleged injury and a remedy. Neither the district court nor this Court have been alerted to any other non-MFA remedy sought by the State under its breach of contract claim. It was therefore not necessary for the district court to determine whether BHC could be liable to the State for a different remedy that the State is not pursuing under its breach of contract theory in this case. As a result, we affirm the district court's ruling to dismiss the State's breach of contract claim under Rule 1-012(B)(6).

**CONCLUSION**

**{36}** For the foregoing reasons, we affirm the district court's Rule 1-012(B)(6) dismissals of the State's complaint against BHC.

**{37}** **IT IS SO ORDERED.**

_____

**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

14

_____
**MICHAEL E. VIGIL, Judge**