[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14302

_____

D.C. Docket No. 4:10-cr-00012-HLM-WEJ-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GEORGE D. HOUSER,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 19, 2014)

Before MARCUS, BLACK, and RIPPLE,[*] Circuit Judges.

RIPPLE, Circuit Judge:

Following a four-week bench trial, George D. Houser was convicted of one count of conspiring with his wife, Rhonda Washington Houser ("Washington"), to commit health care fraud, in violation of 18 U.S.C. § 1349, of eight counts of payroll tax fraud, in violation of 26 U.S.C. § 7202, and of two counts of failure to timely file income tax returns, in violation of 26 U.S.C. § 7203. The district court sentenced Mr. Houser to 240 months' imprisonment and ordered him to pay nearly $7 million in restitution to Medicare and Medicaid and more than $870,000 to the Internal Revenue Service ("IRS"). For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## A. Facts[1]

During the early 1990s, a period before the events giving rise to his conviction, Mr. Houser had operated two nursing home facilities in Rome,

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1] We recite below the facts as found by the district court following Mr. Houser's bench trial. See R.290.

Georgia.  After he failed to pay payroll taxes for employees, the IRS seized one facility, and the State of Georgia revoked Mr. Houser's license to operate nursing homes. The IRS also placed tax liens on the nursing homes.  During the ten years when the liens were active, Mr. Houser occasionally went to the local IRS office to inquire about the pay-off amounts.  Full payment of the amounts owed never was made.

When the liens expired in 2003, Mr. Houser sought to reestablish his control over the two facilities, Mount Berry Convalescent Center and Moran Lake Convalescent Center ("Mount Berry" and "Moran Lake," respectively).  He created Forum Healthcare Group, Inc. ("FHG"), and FHG assumed management of the facilities.  State records and the Medicare and Medicaid provider applications list Washington, Mr. Houser's then-girlfriend, as the owner, president and office manager of FHG.[2]  In September 2003, FHG also assumed management of Wildwood Park Nursing and Rehabilitation Center ("Wildwood") in Brunswick, Georgia.

---

[2]  Mr. Houser and Washington eventually married, but the record does not reveal when the marriage took place.

**1.**

During the period covered by the indictment, Mount Berry, Moran Lake and Wildwood were all licensed care facilities and certified recipients of Medicare and Medicaid funds. The facilities' total capacity was 404 residents, and occupancy rates ranged between seventy-five and ninety percent. Of these residents, approximately eighty to ninety percent had their care funded by Medicare or Medicaid.

In July 2004, Mr. Houser formally assumed control of the three homes. New Medicare provider applications listed a change of ownership from Washington to Mr. Houser, and Mr. Houser was listed as president and chief executive officer. Medicaid applications listed Mr. Houser, along with FHG and Louise K. Houser--Mr. Houser's mother--as the owners. On the Medicare enrollment form, Mr. Houser certified (1) that he "agree[d] to abide by the Medicare laws, regulations, and program instructions that apply to this provider," (2) that he "underst[ood] [t]hat payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . , and on the provider's compliance with all applicable conditions of participation in Medicare," and (3) that he "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for

4

payment by Medicare, and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."[3]  Moreover, on submissions for reimbursement, the provider acknowledged "that payment will be from federal and state funds and that any falsification or concealment of a material fact may be prosecuted under federal and state laws."[4]

## 2.

As nursing facilities governed by 42 U.S.C. § 1396r, the facilities were required to provide residents with a clean, safe and sanitary environment to maintain or support "the highest practicable level of physical, mental, and psychosocial well-being to every resident."[5]  During the period from 2003 to 2007, when the facilities were within Mr. Houser's control, the conditions were, in short, "barbaric" and "uncivilized."[6]

The record discloses countless issues with both the condition of the physical

---

[3] Gov't's Trial Ex. 110 (Medicare Federal Health Care Provider/Supplier Enrollment Application for FHG) at 21.

[4] See, e.g., Gov't's Trial Ex. 116 (Georgia Dep't of Cmty. Health Div. of Med. Assistance Provider Enrollment Application) at 13.

[5] R.290 at 24 (internal quotation marks omitted); see also 42 U.S.C. § 1396r(b)(2) ("A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident . . . .").

[6] R.341 at 4 (Sentencing Tr.).

plants and the provision of services at all of the facilities.  By way of example only, roofs at the facilities leaked so profusely as to flood residents' rooms, damage their personal property, and cause ceiling tiles to fall in residents' rooms and common areas.  Administrators sent Mr. Houser and Washington urgent faxes apprising them of the problems and of the potential hazards to residents.  For instance, on December 22, 2006, an administrator sent a fax to Mr. Houser and Washington that read:  "'**WE HAVE CEILING TILES AND ROOF LEAKS ON RESIDENTS' BEDS AND CLOTHES.  I NEED SOME ONE TO EITHER TAKE CARE OF IT OR BRING MONEY FOR JAMIE** [Young] **TO DO SOMETHING!!!**'"[7]

The dining room at Moran Lake had no heat for the winter of 2006 to 2007; the same facility had no air conditioning in an entire wing from July 2006 to June 2007.  The Wildwood facility was without air conditioning for three months during the spring and summer of 2007, during which time the interior temperature reached ninety degrees.  Mr. Houser and Washington similarly were informed of these issues.[8]

---

[7] R.290 at 39 (alteration in original) (quoting Gov't's Trial Ex. 487 (collection of faxed memoranda from facility administrator to Mr. Houser and Washington)).

[8] See id. at 53, 54.

The homes suffered from "shortages or a <u>complete lack of cleaning supplies</u>" because vendors' bills went unpaid.[9] Bathroom facilities went unattended, and, as a result, the homes "had a strong odor of urine and feces."[10] The laundry facilities frequently were inoperable due to lack of power or disrepair. When a power outage occurred, soiled linens could not be changed in the residents' rooms. Administrators complained frequently to Mr. Houser and Washington about the lack of cleaning and sanitizing supplies.

Trash service was stopped due to Mr. Houser's failure to pay waste removal bills. "When the waste removal services refused to empty the dumpsters at the nursing homes, employees left garbage near the dumpster, which attracted flies and other insects, rodents, and dogs, and generated odors."[11] All of the facilities "experienced fly infestations. Witnesses described seeing flies in the residents' rooms, in the dining rooms, on the residents' food," as well as swarming around "the residents and their sores."[12]

Residents' physical and medical needs regularly were not met.

---

[9] Id. at 65 (emphasis added).

[10] Id. at 67.

[11] Id. at 90.

[12] Id. at 101.

"[M]edications were not available for residents because [Mr. Houser] had not paid the pharmacy bill.  On some occasions, the nurses 'borrowed' the medications from one resident and gave those to another resident[] . . . .  On other occasions, the residents never received the medications they were supposed to have."[13] "Numerous witnesses testified that all three nursing homes frequently ran out of diapers, wound care supplies, and basic nursing supplies."[14]  Laboratory services that had been ordered by a physician, including those for patients on dialysis, were not performed because the bills for such services went unpaid.[15]  The homes went without blood sugar testing devices and strips necessary to monitor diabetic patients.  Patients went without dialysis because the transportation company refused to service the homes due to unpaid bills.[16]  Facilities also were without medical directors and physical therapy services for significant periods of time. The administrators at the facilities informed Mr. Houser and Washington that failure to pay the bills for these services was placing the patients at risk and the homes in jeopardy of closure.

---

[13]  Id. at 144 (emphasis added) (citations omitted).

[14]  Id. at 160 (emphasis added).

[15]  See id. at 173.

[16]  See id. at 219.

The facilities were grossly understaffed due to staffing cuts mandated by Mr. Houser and to payroll difficulties at all three homes.  Although Mr. Houser and Washington repeatedly assured administrators that payroll obligations would be met, this frequently did not occur.  On one occasion, to placate upset staff members, Mr. Houser and Washington handed out fifty dollar bills to employees who could not cash their paychecks.

Resident care directly suffered as a result of staffing shortages.  Residents and their beds were soaked with urine or caked in feces because diapers were not changed.  "The short staffing problem became more severe on paydays, when employees raced to the bank or stood in line to cash their checks at the money van."[17]

Insufficient food was a significant problem because Mr. Houser failed to pay food vendors.  Residents were given small, nutritionally inadequate meals and often little or no milk.  "Residents with special dietary needs often <u>did not receive</u> protein shakes, other dietary supplements, or required therapeutic meals."[18]  Residents regularly complained to both the staff and relatives that they were hungry.

---

[17]  Id. at 208.

[18]  Id. at 264-65 (emphasis added).

A former medical director and other staff reported significant weight loss among the residents.

> Weight loss and malnutrition make nursing home residents more susceptible to disease, infection, and aggravate[] the chronic illnesses that they already have.  Nursing homes must keep track of their residents' weights, and must investigate when a resident loses five percent or more of his or her body weight during a one-month period.[19]

Mr. Houser, however, instructed staff to stop recording patient weight loss, presumably to avoid suspicion in a survey.  Families of residents began to bring in food so that their family members would receive adequate nutrition.  Staff members also would purchase bread and milk from their own funds so that residents would have something to eat.

**3.**

During the relevant period, state officials conducted surveys on an annual basis and also in response to specific complaints.  Mr. Houser appeared to have some advance notice of survey times, and he placed calls to facilities instructing them to increase services and staffing levels during those times.  The record reflects that Mr. Houser and Washington terminated individuals who raised

---

[19] Id. at 222 (alteration in original) (citation omitted) (internal quotation marks omitted).

10

issues of noncompliance or reported them to the authorities.  Staff believed that if they revealed the true conditions at the nursing homes to state surveyors, "they would be 'immediately terminated.'"[20]

Despite Mr. Houser's efforts, the facilities regularly were cited for violations, and, eventually, in 2007, the facilities each were given ratings so low--on the basis of an immediate risk to the health and safety of residents--that closure was required.  In June 2007, the Georgia Office of Regulatory Services ("ORS") gave notice that it was terminating the Medicaid provider agreements for Mount Berry and Moran Lake "because of numerous problems, including unsatisfactory physical environmental conditions, staffing shortages, and irregularities involving resident trust fund accounts."[21]  Three months later, the ORS gave notice that it was closing the Wildwood facility for the same reasons.  When the facilities closed, residents were transferred to other nursing homes.  At new facilities, the arriving residents had no medical histories sent with them.  They were unkempt and complained of hunger, and many hoarded food.

_____

[20]  Id. at 131.

[21]  Id. at 16.

**4.**

Prior to their closure, Medicare and Medicaid had paid FHG $32,914,304.66 for resident care.  Between 2003 and 2007, "$2,282,439 was deposited or transferred directly into Mr. Houser's personal bank[] accounts, $467,949 was deposited or transferred directly into Washington's personal bank[] accounts," and $1,745,620 was deposited or transferred into the operating account of Mr. Houser's construction company, "The Guild"; nearly all of these funds came from an FHG source.[22]  During the same time period, Mr. Houser purchased over $4 million in real estate; "[a] number of checks, signed by [Mr. Houser] and Washington and dated from October 2004 through May 2005, were drawn on FHG or Forum Group Management Services' accounts" to make payments for these properties.[23]  In July 2004, Mr. Houser purchased a home for his ex-wife at a cost of $1.4 million; "approximately six weeks earlier, [Mr. Houser] [had] transferred $1.4 million from the FHG bank account to a personal account in [his] name."[24] Employees of his other businesses, none of which had independent revenue, were sometimes paid directly by FHG.  Mr. Houser's alimony payments, as well as

---

[22] Id. at 352-53.

[23] Id. at 364-65.

[24] Id. at 366.

payments for nanny services and three luxury automobiles, also were drawn from FHG funds.

**5.**

Mr. Houser withheld payroll taxes but, beginning with the last quarter of 2003, failed to turn over the withheld amounts to the IRS (he also periodically did not remit health insurance premiums, disability insurance premiums and child support garnishments).  The IRS repeatedly informed Mr. Houser and Washington about the failure to pay the taxes.  In 2005, Washington gave Revenue Officer Odell Justice ten checks drawn from the FHG operating account to pay, in part, the past-due payroll taxes; Washington also gave Officer Justice instructions as to when the checks could be deposited.  The first two checks cleared; however, when Officer Justice attempted to deposit the third and fourth checks, they were returned for insufficient funds, and Officer Justice did not attempt to deposit the remainder of the checks.  Consequently, in February 2005, Officer Justice notified Mr. Houser and Washington "that the IRS would impose payroll tax recovery penalties, or trust fund recovery penalties, against [them] for the taxes due from

13

the fourth quarter of 2003."[25]  Later that month, Officer Justice received twenty checks signed by Washington in various amounts with notations that they represented payroll taxes for the fourth quarter of 2004.  Ten of those checks cleared; the remainder, totaling $157,000, bounced.  Officer Justice then referred the matter to the IRS criminal investigation division.

On November 17, 2005, IRS criminal investigators executed a search warrant on the FHG offices.  During late 2006 and 2007, attorneys for Mr. Houser made partial payments toward taxes due for the fourth quarter of 2004 and the second quarter of 2005.  As of the close of the district court record, $806,305 still was owed for the first quarter of 2004, the fourth quarter of 2004, and the second quarter of 2005.

In addition to the payroll tax deficiencies, Mr. Houser failed to file his 2004 personal tax return until April 2008, three years after it was due and two-and-one-half years after the IRS initiated its criminal investigation.  According to the district court record, Mr. Houser has yet to file a 2005 return.

**B.  Proceedings in the District Court**

In 2011, the Government charged Mr. Houser and Washington in an

---

[25] Id. at 398.

14

eleven-count indictment.  Count One alleged that both defendants had entered into a conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349.  Counts Two through Nine alleged that, on eight occasions occurring during the first and fourth quarters of 2004 and the second quarter of 2005, Mr. Houser had failed to pay over to the IRS some $806,000 in payroll tax payments, in violation of 26 U.S.C. § 7202.  Counts Ten and Eleven alleged a failure by Mr. Houser to timely file personal income tax returns for tax years 2004 and 2005, in violation of 26 U.S.C. § 7203.

Mr. Houser pleaded not guilty and moved to dismiss the indictment.  His motion was denied, and the case proceeded to a bench trial on a superseding indictment.  Washington was dismissed from the case and permitted to plead guilty to another indictment alleging misprision of a felony.

Mr. Houser's four-week trial included the testimony of eighty Government witnesses and nearly seven hundred exhibits.  Mr. Houser moved, at the close of the Government's evidence and again at the close of all of the evidence, for a judgment of acquittal, which the district court denied.[26]

On April 2, 2012, the district court entered a 471-page order that included

---

[26]  Mr. Houser then filed a pro se motion for a mistrial and, in the alternative, for a new trial.  The court ordered Mr. Houser's pro se motion and attached exhibits stricken from the record.

detailed findings concerning the neglected state of the properties, the lack of services and attention to the residents, and Mr. Houser's appropriation of Medicare and Medicaid payments to FHG for his own use. The district court found Mr. Houser guilty on all counts. Specifically, with respect to Count One of the indictment, charging Mr. Houser with conspiring with Washington to commit health care fraud, the district court determined that

> [t]he Government ha[d] proved beyond a reasonable doubt that the three Forum nursing facilities, Mt. Berry, Moran Lake, and Wildwood, under the direction of Defendant, submitted or caused to be submitted, during the course of the conspiracy, false or fraudulent claims to the Medicare and Georgia Medicaid programs for services that were worthless in that <u>they were not provided or rendered</u>, were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life of the residents of the Nursing Facilities, and were of a quality that failed to meet professionally recognized standards of health care.[27]

Turning to Counts Two through Nine, the court found that Mr. Houser willfully had failed to pay over taxes withheld from the wages of employees in the calendar quarters alleged in the indictment. It determined that the late payments made by Mr. Houser's attorney "were ineffective, after the fact attempts to reduce Defendant's criminal liability."[28] Finally, the court found that Mr. Houser

---

[27] Id. at 428 (emphasis added).

[28] Id. at 465.

willfully had failed to timely file his income tax returns for 2004 and 2005. Again, it concluded that Mr. Houser's

> action of filing a personal income tax return for 2004 in April 2008, after Defendant learned that he was the subject of an IRS criminal investigation, was an ineffective, after the fact attempt by Defendant to avoid criminal liability for his previous failure to file a personal income tax return.[29]

At his sentencing hearing, Mr. Houser spoke on his own behalf and, while acknowledging some of the facts proved at trial, continued to argue that much of what the court had concluded regarding his nursing homes was false. The district court sentenced Mr. Houser to 120 months' imprisonment--the statutory maximum--on Count One. The court sentenced him to 60 months' imprisonment on each of Counts Two through Eleven, which were staggered such that the resulting sentence on all tax-related counts was an additional 120 months' imprisonment, for a total of 240 months, a sentence within the advisory guidelines range. The court also ordered Mr. Houser to pay restitution to Medicare and Medicaid in the amount of $6,742,807.88. The court arrived at this figure after concluding that approximately twenty to twenty-five percent of the services Mr. Houser provided under those programs were "worthless."[30] The court ordered

---

[29] Id. at 469.

[30] R.341 at 4.

17

restitution to the IRS in the amount of $872,515.  The court also entered an order of forfeiture.

Mr. Houser timely appealed his conviction, as well as the court's forfeiture order.

## II

### A. Health Care Fraud Count

Count One of the Second Superseding Indictment charged Mr. Houser and Washington with conspiring to commit health care fraud in violation of 18 U.S.C. § 1349.[31]  Section 1349 requires an agreement to commit the underlying offense, namely that the defendant (1) "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice" (2) "to defraud any health care benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program," (3) "in connection with the delivery of or payment for health care benefits, items, or services."  18 U.S.C. § 1347.

The district court found that Mr. Houser and Washington, working together,

_____

[31] Section 1349 of Title 18 provides:  "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

knowingly submitted to Medicare and Georgia Medicaid claims for services that

had not been rendered.  The district court stated:

> Specifically, the Government has proved beyond a reasonable doubt
> that the three Forum nursing facilities, Mt. Berry, Moran Lake, and
> Wildwood, under the direction of Defendant, submitted or caused to
> be submitted, during the course of the conspiracy, false or fraudulent
> claims to the Medicare and Georgia Medicaid programs for services
> that were worthless in that they were not provided or rendered, were
> deficient, inadequate, substandard, and did not promote the
> maintenance or enhancement of the quality of life of the residents of
> the Nursing Facilities, and were of a quality that failed to meet
> professionally recognized standards of health care.[32]

On appeal, Mr. Houser does not contest the deplorable conditions of his

nursing homes; indeed, he recites, in detail, those conditions in his opening brief.

He admits that

> Forum routinely failed to pay the expenses of the nursing facilities,
> including bills for clinical laboratory services, physical therapy,
> transport services, telephone service, mobile x-ray services, pharmacy
> services, and various medical, nursing and cleaning supplies, as well
> as repair costs for washing machines and dryers, dishwashers, air
> conditioners and heaters, medical equipment, and leaking roofs.[33]

He also admits that "[t]he administrators of the nursing facilities and other staff

warned Mr. Houser, through telephone calls, e-mails and faxes, of these

---

[32]  R.290 at 428 (emphasis added).

[33]  Appellant's Br. 18-19 (citations omitted).

19

deficiencies."[34]  Instead, Mr. Houser maintains that the district court erred in employing a "worthless services" concept in evaluating his guilt under the health care fraud statute.  Moreover, he maintains that the record does not support a finding that he conspired with Washington--or anyone else--to violate 18 U.S.C. § 1347.  We evaluate each of these arguments in turn.

### 1.  Worthless Services

Mr. Houser first takes issue with the district court's use of the "worthless services" concept.  Mr. Houser claims that "[t]he concept of 'worthless services' derives from civil suits brought under the False Claims Act."[35]  According to Mr. Houser, "[a] claim of 'worthless services' can be the basis for a false claims action, if the plaintiff can show that 'the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all.'"[36]

Mr. Houser submits, however, that "engrafting a 'worthless services' concept onto the federal health care fraud statute renders the statute unconstitutionally vague and, therefore, void" because "determining at what point

---

[34]  Id. at 18.

[35]  Id. at 34.

[36]  Id. (quoting Mikes v. Straus, 274 F.3d 687, 703 (2d Cir. 2001)).

20

health care services have crossed the line from merely bad to criminally worthless would leave many men of common intelligence guessing."[37]  Mr. Houser distinguishes his case from those in which "the service for which a provider seeks reimbursement was never provided, see United States v. Hoffman-Vaile, 568 F.3d 1335 (11th Cir. 2009), or unnecessary, see United States v. Mateos, 623 F.3d 1350 (11th Cir. 2010), or not covered, see [United States v.] Medina, 485 [F.3d 1291,] 1299 [(11th Cir. 2007)]."[38]  The district court's definition of worthless services, Mr. Houser continues, strays from these situations in that it introduces the idea of desirability into the calculus.  In his view, the concept has no place in an evaluation of worthlessness because what is totally undesirable to one person nevertheless may have value for another.

"We review whether a criminal statute is unconstitutionally vague de novo." United States v. Wayerski, 624 F.3d 1342, 1347 (11th Cir. 2010).  We do not believe that Mr. Houser's conviction requires us to draw the proverbial line in the sand for purposes of determining when clearly substandard services become "worthless."  Although the indictment in this case sometimes describes "the care, services and environment provided by the Nursing Facilities" as being "so

---

[37]  Id. at 35-36 (internal quotation marks omitted).

[38]  Id. at 41.

21

inadequate or deficient as to constitute worthless services,"[39] Mr. Houser was not prosecuted solely on the basis of the deficient nature of some of the services provided. It is clear both from the indictment and the district court's order of conviction that Mr. Houser also was prosecuted and convicted for failing to provide services that he had certified to Medicare and Georgia Medicaid had been provided to the residents in his homes.

The indictment alleges that "[f]ederal statutes and regulations mandate that nursing facilities comply with federal requirements relating to the provision of services and quality of care. 42 U.S.C. § 1396r(b)."[40] The indictment continues:

> "A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A). Additionally, nursing facilities "must provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a plan of care which . . . describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met . . . [.] 42 U.S.C. § 1396r(b)(2)(A); 42 C.F.R. § 483.25.[41]

The indictment goes on to describe how Mr. Houser's nursing facilities failed to provide required services: "On numerous occasions, the defendants owed

---

[39] R.139 at 12-13, ¶ 36.

[40] Id. at 6, ¶ 17.

[41] Id. at 6-7, ¶ 17 (alteration in original).

22

considerable sums to many Nursing Facility vendors through consistent delinquency in payment or failure to pay despite promises and representations to the contrary.  Defendants <u>curtailed crucial services</u> provided to residents by failing to pay the vendors who provided such services.["42](42)  The fraudulent activity alleged in the indictment was based on the submission of claims for both the <u>lack of services</u>, as well as services that were "deficient, inadequate, [or] substandard":

> 92.  The Nursing Facilities submitted or caused to be submitted, during the course of the conspiracy, false or fraudulent claims to the Medicare and Georgia Medicaid program for services that were <u>worthless in that they were not provided or rendered</u>, were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life of the residents of the Nursing Facilities, and were of a quality that failed to meet professionally recognized standards of health care.[43]

And, again, a few paragraphs later:  "During the course of the conspiracy, defendants GEORGE D. HOUSER and RHONDA HOUSER fraudulently caused claims to be paid by Medicare and Georgia Medicaid for care and services that were either <u>not rendered</u> or were so inadequate or deficient as to constitute worthless services."[44]

The district court's order of conviction also rested, at least in part, on the

---

[42] Id. at 17, ¶ 55 (emphasis added).

[43] Id. at 29, ¶ 92 (emphasis added).

[44] Id. at 30, ¶ 95 (emphasis added).

facilities' <u>failure</u> to provide necessary services.  The district court explicitly found that there were occasions when "residents never received the medications that they were supposed to have,"[45] residents went without diapers and medical care for their wounds,[46] laboratory services were not performed,[47] and residents were not transported for dialysis[48] or provided with physical therapy.[49]  Moreover, it is clear from the court's order that the complete lack of some services served as one of the bases for the district court's determination that the Government had met its burden of proof with respect to the conspiracy charge:

> 13.  For the following reasons, the Court finds that the Government has proved beyond a reasonable doubt that Defendant conspired with his wife, Washington, to defraud the Medicare and Georgia Medicaid programs and to obtain by means of material false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, the Medicare program and Georgia Medicaid, in connection with the delivery of and payment for health care benefits and services, in violation of 18 U.S.C. §§ 1347 and 1349.

> 14.  Specifically, the Government has proved beyond a reasonable doubt that the three Forum nursing facilities, Mt. Berry, Moran Lake, and Wildwood, under the direction of Defendant,

---

[45] R.290 at 144.

[46] See <u>id.</u> at 160.

[47] See <u>id.</u> at 173.

[48] See <u>id.</u> at 219.

[49] See <u>id.</u> at 195.

submitted or caused to be submitted, during the course of the conspiracy, false or fraudulent claims to the Medicare and Georgia Medicaid programs <u>for services that were worthless in that they were not provided or rendered</u>, were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life of the residents of the Nursing Facilities, and were of a quality that failed to meet professionally recognized standards of health care. . . .

15.  The Government has proved beyond a reasonable doubt that, during the course of the conspiracy, Defendant fraudulently caused claims to be paid by Medicare and Georgia Medicaid for care and services that were either <u>not rendered</u> or were so inadequate or deficient as to constitute worthless services.[50]

Although acknowledging that some services simply were not provided to residents, Mr. Houser nevertheless argues that, for purposes of Medicare and Georgia Medicaid reimbursements, these services are "bundled."  Consequently, he urges, we must evaluate the provision of services as a whole and cannot evaluate whether residents were deprived of a single, although necessary, service.

---

[50]  <u>Id.</u> at 427-29 (emphasis added).  At oral argument, Mr. Houser's counsel maintained that the Government proceeded only on a worthless services theory, that it had not prosecuted Mr. Houser for seeking reimbursement from Medicare and Georgia Medicaid for services that the nursing homes <u>had failed</u> to provide, and that, if the failure to provide services were the basis for the prosecution, Mr. Houser had not been given adequate notice.  Counsel pointed specifically to the district court's comments at sentencing (concerning the calculation of loss) to support this contention.  <u>See</u> R.341 at 3-4.

We believe that the cited passages of the indictment clearly put Mr. Houser on notice that the Government considered his fraudulent scheme to include the submission of claims for services that were <u>not rendered</u> as well as the submission of claims for services that were so substandard as to constitute worthless services.  Moreover, the cited passages of the conviction order establish that the district court rested its determination of guilt on Count One, at least in part, on Mr. Houser's complete failure to provides some services.

25

Mr. Houser maintains that this approach is mandated by United States ex rel. Sanchez-Smith v. AHS Tulsa Regional Medical Center, LLC, 754 F. Supp. 2d 1270 (N.D. Okla. 2010), and United States ex rel. Swan v. Covenant Care, Inc., 279 F. Supp. 2d 1212 (E.D. Cal. 2002).

Even if we were bound to follow these cases, and we are not, we could not conclude that they require reversal of the district court's judgment.  Turning first to Sanchez-Smith, the court held that, for purposes of bringing a qui tam action under the False Claims Act, a plaintiff could "reach a jury on a factual falsity theory in the context of 'bundled' per diem Medicaid billing" by "present[ing] facts amounting to (1) the provision of entirely worthless services, or (2) at a minimum, the provision of grossly negligent services with regard to a particular standard of care or regulatory requirement."  754 F. Supp. 2d at 1287 (citation omitted) (internal quotation marks omitted).  The court then concluded that the relators had failed to "demonstrate the provision of worthless services or anything amounting to gross negligence" because, in the most egregious case, one patient had received 677.25 of the 840 hours of required therapy.  Id.  Under those circumstances, the court concluded that "[n]o reasonable jury could conclude that TRMC billed Medicaid for worthless services provided to Patient 19, and no reasonable jury could conclude that TRMC billed Medicaid for even 'grossly

26

negligent' services provided to Patient 19." Id.  Here, however, the facts are very different.  The indictment alleged, and the district court found, that patients went entirely without necessary services such as physical therapy, medication, dialysis and wound care.  Moreover, we note that the district court concluded that Mr. Houser had actual knowledge of the conditions and lack of services in his nursing homes "through an almost daily barrage of telephone calls, emails, and faxes from the administrators at all three nursing homes during the entire period of the conspiracy, yet Defendant affirmatively chose to ignore these alerts."[51]  In short, the record reflects not simply "gross negligence" in the provision of required services, but an intentional disregard of those requirements.

Swan also does little to assist Mr. Houser.  In that case, a plaintiff in a qui tam action alleged that a nursing facility was "so severely understaffed . . . that patients were often denied the most basic care such as repositioning, feeding, bathing, and wound treatment."  Swan, 279 F. Supp. 2d at 1216.  The district court granted summary judgment for the defendant, Covenant Care, on the ground that the court lacked subject matter jurisdiction over the action because the essential elements of the plaintiff's claims had been disclosed in a previous action.  See id. at 1217-20.  The court then went on to state that, even if it had jurisdiction,

---

[51] R.290 at 435.

27

"Covenant Care would still be entitled to summary judgment on [the] false records claim." Id.  The court observed that "Covenant Care does not bill the government separately for individual acts of patient care such as feeding, turning, or bathing. Instead, the government pays Covenant Care a per diem rate for providing room and board, including the provision of such routine services . . . ." Id. at 1221.  The court then concluded that "[b]ecause Swan does not allege that Covenant Care's neglect of its patients was so severe that, for all practical purposes, the patients were receiving no room and board services or routine care at all, her FCA claim does not fit within the worthless services category." Id. (emphasis added). Without endorsing or adopting the standard set forth in Swan, we note that Mr. Houser's situation is markedly different.  In the present case, the district court's judgment does not simply rest on the fact that some services were severely substandard; it rests on the fact that certain services, including those mandated by statute,[52] were not provided to residents at all.[53]

_____

[52] By way of example only, 42 U.S.C. § 1396r(b)(4)(A) states that "a nursing facility must provide . . . (i) . . . rehabilitative services . . . ; (iii) pharmaceutical services . . . ; [and] (iv) dietary services that . . . meet the daily nutritional and special dietary needs of each resident."

[53] Because the Government proceeded, and the district court's conviction rested, at least in part, on the nursing facilities' complete failure to provide some necessary services to the residents, we need not consider whether the concept of worthless services based on inadequacy or undesirability is unconstitutionally vague.  See Appellant's Br. 35-39.

In his reply brief, Mr. Houser suggests that the Government used his profit margin of twenty-five percent to establish the element of willfulness.  This strategy, he continues,

(continued...)

28

We believe this conclusion is consonant with that reached by the Court of Appeals for the Sixth Circuit in Chesbrough v. VPA, P.C., 655 F.3d 461 (6th Cir. 2011), on which Mr. Houser relies.  In Chesbrough, relators had filed a False Claims Act action against VPA alleging "that VPA defrauded the government by submitting Medicare and Medicaid billings for defective radiology studies."  Id. at 464.  The court held that the relators' action could not go forward on the basis of

---

[53](...continued)
contributed to the vagueness of the statute because "it is impossible to state with any degree of certainty that a 'person of ordinary intelligence' necessarily would realize that he could be prosecuted criminally for health care fraud if he runs his nursing home for-profit and takes what the Government considers to be too much in profits."  Reply Br. 5.  Again, Mr. Houser's argument misses the mark.  The Government did not charge Mr. Houser with taking an excessive profit; it charged him, and the district court found him guilty of, a scheme wherein he consciously disregarded his legal obligations to provide basic services to Medicare and Medicaid beneficiaries, while simultaneously diverting substantial funds to personal uses.  His purchases evidence that he had funds available to pay for those services, but that he intentionally used those funds for other purposes.

Mr. Houser's brief does not raise a facial vagueness objection to the health care fraud statute under which he was prosecuted.  See Reply Br. 9 ("Mr. Houser[] . . . does not challenge the clarity of § 1347 as a statute . . . .").  Moreover, we do not believe Mr. Houser reasonably could argue that the statute is unconstitutionally vague because it criminalizes the complete failure to provide some services.  As the Court of Appeals for the Sixth Circuit recognized in United States v. Semrau, 693 F.3d 510 (6th Cir. 2012), "[a]lthough the health care fraud statute does not (and could not) specify the innumerable fraud schemes one may devise, it is difficult to imagine a more obvious way to commit healthcare fraud than billing for services not actually rendered."  Id. at 530 (citation omitted) (internal quotation marks omitted).  Moreover, the mens rea requirement contained in the statute, see 18 U.S.C. § 1347 ("Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice-- . . . shall be fined under this title or imprisoned not more than 10 years, or both." (emphasis added)), largely mitigates any ambiguity, see United States v. Conner, 752 F.2d 566, 574 (11th Cir. 1985) ("'The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain.  But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.'" (quoting Screws v. United States, 325 U.S. 91, 102, 65 S.Ct. 1031, 1036, 89 L. Ed. 1495 (1945) (plurality opinion))).

29

VPA's reimbursement claims for the x-ray studies that were "'suboptimal' or of 'poor quality.'" Id. at 467-68.  Nevertheless, the court determined that the relators could go forward on the basis of five studies that were "nondiagnostic." Id. at 468 (internal quotation marks omitted).  It reasoned that, "[i]f VPA sought reimbursement for services that it knew were not just of poor quality but had no medical value, then it would have effectively submitted claims for services that were not actually provided.  This would amount to a 'false or fraudulent' claim within the meaning of the FCA." Id.   As the defendants in Chesbrough did, Mr. Houser sought reimbursement from Medicare and Georgia Medicaid for required services--pharmaceutical, diagnostic, medical and dietary--that simply were not provided.

### 2.  Proof of Conspiracy

Mr. Houser also challenges his conviction on Count One on the ground that the "evidence did not establish that Mr. Houser conspired either with Rhonda Houser or with anyone else."[54] According to Mr. Houser, "[n]either Rhonda Houser nor anyone else had any control or authority over how the funds were

---

[54]  Appellant's Br. 43.

30

allocated or how the nursing homes were run."[55]

We typically "review challenges to the sufficiency of the evidence in criminal cases de novo, viewing the evidence in the light most favorable to the [G]overnment." United States v. Dominguez, 661 F.3d 1051, 1061 (11th Cir. 2011). Here, however, Mr. Houser never challenged the sufficiency of the evidence before the district court. The only basis for his motion for acquittal on the conspiracy count was his vagueness challenge.

> [W]here a defendant fails to preserve an argument as to the sufficiency of the evidence in the trial court, the predominant rule in this circuit--established by a long and unchallenged line of cases--is better stated as requiring that we uphold the conviction unless to do so would work a "manifest miscarriage of justice."

United States v. Fries, 725 F.3d 1286, 1291 n.5 (11th Cir. 2013) (quoting United States v. Perez, 661 F.3d 568, 573-74 (11th Cir. 2011) (per curiam)). Regardless of the standard applied, however, Mr. Houser's sufficiency challenge fails.

We frequently have noted that "direct evidence of an agreement is unnecessary; the existence of the agreement and a defendant's participation in the conspiracy may be proven entirely from circumstantial evidence." United States v. McNair, 605 F.3d 1152, 1195 (11th Cir. 2010). Here the record is replete with evidence that Washington knew of the lack of provisions and services in the

---

[55] Id. at 44.

31

nursing homes;[56] that she had access to and control over nursing home funds;[57] and

that she was involved in efforts to placate employees,[58] mask the poor conditions

at the homes[59] and stave off government enforcement actions.[60]  We believe that

this is more than sufficient circumstantial evidence to establish Washington's

agreement to participate in the conspiracy to defraud Medicare and Georgia

Medicaid.[61]

---

[56] See, e.g., Gov't's Trial Ex. 487 at 2 (fax apprising Mr. Houser and Washington of numerous issues including the state of the roof, lack of transportation services and lack of laboratory services); Gov't's Trial Ex. 492 (fax to Washington complaining of broken dishwasher and pest control problems); Gov't's Trial Ex. 499 (fax apprising Washington that Medicare Part A patients would have to be discharged because the home did not have sufficient wheelchairs to conduct physical therapy); Gov't's Trial Ex. 504 (fax apprising Washington of the lack of nursing supplies).

[57] See, e.g., R.223 at 28 (testimony concerning Washington's use of the residents' trust account); R.225 at 68-69 (testimony concerning Washington's control over the nursing home's operating account).

[58] See R.242 at 844 (testimony concerning Mr. Houser and Washington handing out fifty dollar bills to employees).

[59] See R.260 at 64-69 (testimony concerning Washington bringing in food to satisfy the Inspector General for Medicaid for the Department of Community Health that a home had enough food to last through the weekend).

[60] See R.244 at 81-82 (testimony concerning Washington's delivery of, and instructions for depositing, payroll tax checks to Officer Justice).

[61] It is of no moment that the Government dismissed the conspiracy charge against Washington.  "[A]s a simple matter of logic, the government's voluntary dismissal of a conspiracy charge against a defendant's only alleged coconspirator does not preclude proof beyond a reasonable doubt, at defendant's trial, that the defendant conspired with that same alleged coconspirator."  United States v. Lopez, 944 F.2d 33, 40 (1st Cir. 1991).  Indeed, even if Washington had been tried and acquitted of the conspiracy charge, it would not have affected the validity of Mr. Houser's conviction.  See United States v. Andrews, 850 F.2d 1557, 1561 (11th

(continued...)

**B. Failure to File Quarterly Payroll Taxes**

Mr. Houser challenges the sufficiency of the evidence with respect to Counts Two through Nine, which charged him with payroll tax fraud, in violation of 26 U.S.C. § 7202.  In evaluating Mr. Houser's sufficiency claim, we inquire whether "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>United States v. Mintmire</u>, 507 F.3d 1273, 1289 (11th Cir. 2007) (internal quotation marks omitted).  We view the evidence in the light most favorable to the Government and draw all reasonable inferences in favor of supporting the verdict.  <u>Id.</u>

Section 7202 of Title 26 of the United States Code provides:

> Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

Here, the Government alleged, and the district court found, that Mr. Houser willfully failed to pay payroll taxes for his homes during various quarters of 2004 and 2005.

With respect to these counts, Mr. Houser admits that he failed to satisfy his

---

[61](...continued)
Cir. 1988).

33

tax liability for the quarters at issue.  He maintains, however, that "the Government failed to establish the critical element of 'willfulness.'"[62]  He correctly observes that "the term 'willfully' as used in the Internal Revenue statutes 'generally connotes a voluntary, intentional violation of a known legal duty.'"[63]  He contends that his "frequent visits to the Revenue Officer, earnest representations of both problems and progress--made to a revenue official accusing him of fraud--and large remedial payments" belie the district court's conclusion that his conduct in failing to turn over payroll taxes to the IRS was willful.[64]  We cannot accept this argument.

Although Mr. Houser made frequent visits to Officer Justice, the evidence reveals that those visits were an effort to stave off further investigation and prosecution, as opposed to an effort to correct an innocent mistake.  First, there is no question that Mr. Houser understood both his responsibility to pay payroll taxes and the consequences for failure to do so[65]:  Mr. Houser only regained control of his nursing homes after waiting out a ten-year tax lien placed on the

---

[62] Appellant's Br. 47.

[63] Id. (quoting United States v. Pomponio, 429 U.S. 10, 12, 97 S. Ct. 22, 23, 50 L. Ed. 2d 12 (1976) (per curiam)).

[64] Id. at 51.

[65] Mr. Houser is a graduate of Harvard College and Harvard Law School and a member of the Georgia Bar, although he did not actively practice law during the relevant period.

homes for his prior failure to pay over payroll taxes.  Second, in his dealings with Officer Justice, he was less than forthcoming.  During interviews with Officer Justice, Mr. Houser both misrepresented his assets and gave contradictory information concerning his financial position.  He asked for and received payout amounts and, within months of doing so, would purchase additional land for investments as opposed to paying his taxes.  Finally, Mr. Houser only began making "increasingly large remedial payments,"[66] after a search warrant was executed at his office, revealing that the Government had initiated a criminal investigation of his activities.  We believe that this record, taken as a whole, reveals that Mr. Houser apprehended his obligation to pay over payroll taxes, but voluntarily and intentionally chose to spend available funds on the acquisition of personal goods and investment properties as opposed to satisfying his legal obligations.  The record, therefore, amply supports the district court's conviction.

## C.  Failure to File Income Tax Returns

With respect to Counts Ten and Eleven, Mr. Houser was convicted of violating 26 U.S.C. § 7203, which provides in relevant part:

> Any person required under this title to pay any estimated tax or

---

[66] Id. at 50.

tax, . . . who willfully fails to pay such estimated tax or tax, . . . at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution.

Mr. Houser maintains that the Government did not prove the statutory elements as to either Count Ten, concerning his failure to timely file his 2004 income tax return, or Count Eleven, concerning his failure to file his 2005 return. Because Mr. Houser makes arguments unique to each of these counts, we separately address each count.

**1.**

With respect to Count Ten, Mr. Houser maintains that the Government did not establish that he had failed to file his return. Mr. Houser invites our attention to the fact that he did file his 2004 personal return, albeit on April 8, 2008. He notes that in United States v. Goetz, 746 F.2d 705, 707 (11th Cir. 1984), we recited the following elements for a violation of § 7203: "[T]he taxpayer was required to file an income tax return; the taxpayer failed to file such return; and the taxpayer's violation was willful." Because, he continues, the Government did not prove that he failed to file a return, his conviction on Count Ten cannot be

36

sustained.

Section 7203 of Title 26 clearly requires the timely filing of personal income tax returns; it criminalizes the willful failure to pay income taxes "at the time or times required by law or regulations." Id. (emphasis added). Section 6072(a) of Title 26 sets forth the general rule that "returns made on the basis of the calendar year shall be filed on or before the 15th day of April following the close of the calendar year." Mr. Houser's personal income tax return for calendar year 2004 was therefore due on April 15, 2005. He did not file his 2004 return, however, until nearly three years later on April 8, 2008. As the Supreme Court has observed, "[p]unctuality is important to the fiscal system," and the sanctions set forth in § 7203 are designed "to assure punctual as well as faithful performance of these duties." Spies v. United States, 317 U.S. 492, 496, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943). "The statute in question would be meaningless if a taxpayer could file beyond the required date and not be subject to legal sanctions." United States v. Greenlee, 380 F. Supp. 652, 660-61 (E.D. Pa. 1974); see also United States v. Ming, 466 F.2d 1000, 1005 (7th Cir. 1972) (holding that a "late filing and late tax payment are immaterial on the issue of willfulness in a Section 7203 prosecution"). The language we employed in Goetz does not, indeed could not, alter the statutory requirement of timeliness. Timeliness simply was not at issue in

37

Goetz, and our shorthand recitation of the elements of the offense sufficed for the purposes of addressing the arguments made in that case.

Mr. Houser also maintains that the Government failed to establish that his failure to timely file a 2004 return was willful. As noted previously, "the standard for the statutory willfulness requirement is the voluntary, intentional violation of a known legal duty." Cheek v. United States, 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991) (internal quotation marks omitted). Here, nothing in the record suggests that Mr. Houser's failure to file his 2004 return by April 15, 2005, was involuntary or negligent.

## 2.

Turning to his arguments with respect to Count Eleven, Mr. Houser submits that the Government failed to establish that his failure to file his 2005 tax return was "willful." He relies on Edwards v. United States, 375 F.2d 862 (9th Cir. 1967), as support for his position that the Government failed to establish this element.

We perceive a number of problems with Mr. Houser's argument. First, at closing arguments, Mr. Houser's counsel conceded that the Government had met its burden of proof with respect to Count Eleven: "The '05 was a different story,

38

he didn't file them, should have, and the Government proved it.  Let's not worry about that.  <u>He should be found guilty of that</u>."[67]  Although, "in the event of errors in the trial or jury instructions, a concession of guilt would not hinder the defendant's right to appeal," <u>Florida v. Nixon</u>, 543 U.S. 175, 188, 125 S.Ct. 551, 561, 160 L.Ed.2d 565 (2004), Mr. Houser is not raising trial errors or errors in legal standards; he challenges only the sufficiency of the evidence.  Mr. Houser's counsel invited the court to conclude that the Government had met its burden of proof with respect to all of the elements of Count Eleven; having done so, he cannot now claim error in the court's determination that the Government did, in fact, meet that burden.  <u>See</u> <u>United States v. Ross</u>, 131 F.3d 970, 988 (11th Cir. 1997) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." (internal quotation marks omitted)).

Even if we were to consider Mr. Houser's argument, however, it has no merit.  The language in <u>Edwards</u> on which Mr. Houser relies concerns a different section of the tax statutes than that which serves as the basis for Mr. Houser's conviction.  Addressing Edwards's challenge to the sufficiency of the Government's showing of willfulness with respect to his convictions for violations

---

[67]  R.340 at 37 (emphasis added).

39

of 26 U.S.C. § 7201,[68] the Ninth Circuit stated:

> The trouble in this case is in its lack of proof of willfulness in the sense of a specific intent to evade or defeat the tax or its payment. <u>Evasion and defeat, as we understand their use in this section, contemplate an escape from tax and not merely a postponement of disclosure or payment</u>. . . .  Tax evasion, however, focuses on the accused's intent to deprive the Government of its tax moneys, and this requires more than just delay.

<u>Edwards</u>, 375 F.2d at 867 (emphasis added) (footnote omitted).  Mr. Houser, however, was not convicted of "attempt[ing] to evade or defeat any tax" under § 7201; he was convicted of failure to file a return under § 7203.  The Ninth Circuit's interpretation of "[e]vasion and defeat," therefore, has no application to Mr. Houser.[69]

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**

---

[68]  At the time <u>Edwards v. United States</u>, 375 F.2d 862 (9th Cir. 1967), was decided, 26 U.S.C. § 7201 (1964) provided:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

[69]  On appeal, Mr. Houser also challenges the forfeiture order.  His sole argument, however, is that the forfeiture order must be vacated because it is premised on the health care fraud charge contained in Count One.  <u>See</u> Appellant's Br. 54-55.  Because we uphold Mr. Houser's conviction on Count One, we also uphold the district court's forfeiture order.